Nazareno S. MEDEI and
Irene R. Medei

v.

BETHLEHEM STEEL CORPORATION
and General Pension Board.

Raymond W. FOULKE, Jr., et al.

v.

BETHLEHEM 1980 SALARIED
PENSION PLAN, et al.

Andrew KAVCAK, et al.

v.

BETHLEHEM 1980 SALARIED
PENSION PLAN, et al.

Civ. A. Nos. 82–5273, 82–5160, 83–513.

United States District Court,
E.D. Pennsylvania.

July 18, 1985.

Joel Ziev, Easton, Pa., for Medei.

Stewart A. Bergstein, Allentown, Pa., for Foulke.

Bernard O'Hare, Bethlehem, Pa., for Kavcak.

Dona S. Kahn, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

Before this Court are three cases involving Bethlehem Steel's 1980 Salaried Pension Plan. All three cases involve the denial of a lump-sum form of payment of retirement benefits. Plaintiffs Raymond and Alice Foulke, Nazareno and Irene Medei, and Andrew and Marian Kavcak, allege violations of the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* (ERISA). Specifically, they contend that the General Pension Board's denial of their requests for a lump-sum payment of retirement benefits violated §§ 1132 and 1133 of ERISA.[1]

Defendants in all three cases have moved for summary judgment, contending that there are no material issues of fact in dispute and that the denial of the lump-sum

---

**1.** The Medeis also allege a violation of 26 U.S.C. § 401, *et seq.,* presumably contending thereby that the Board discriminated in favor of officers, shareholders or highly compensated employees when granting lump-sum payment requests.

payment was not arbitrary or capricious as to any of the plaintiffs. The Foulke plaintiffs countered the affidavit of defendants in support of their motion with one of their own, while the Medei plaintiffs rely upon purported inconsistencies in the deposition testimony of defendants' representatives to support their contention that material issues of fact remain, precluding summary judgment. The Kavcak plaintiffs have not responded to the motion for summary judgment.

■ Because the legal issues involved are common to all three cases and the facts particular to each set of plaintiffs are largely immaterial to the result, the decision as to the Kavcaks will not be premised upon their failure to respond to the motion for summary judgment, although such would be justified. Fed.R.Civ.P. 56(e), Local R.Civ.P. 20(c).

■ Despite urging that there are factual issues in dispute, the Foulke plaintiffs are nevertheless "in substantial agreement with the statement of the case as set forth in the Memorandum filed on behalf of Defendants". (Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, CA 82–5160, Doc. # 49, at 2.) The Medeis claim that the issue of fact in dispute is whether the action of the General Pension Board was arbitrary and capricious in denying them the lump-sum form of payment. That, however, is a legal conclusion rather than a factual determination. Facts which reveal inconsistencies in the application of the standards governing the granting of the lump-sum option could, of course, justify a conclusion that the Board acted arbitrarily and capriciously with respect to these plaintiffs. *See, District 2, United Mine Workers of America, et al. v. Helen Mining Co., et al.*, 762 F.2d 1155 (3d Cir.1985).

There are in reality two sets of facts relevant here, those relating to the administration of the Pension Plan with respect to the lump-sum payment option and those relating to the specific reasons that the plaintiffs in these cases were denied that option. The specific facts will be more understandable against the backdrop of the Plan provisions, and so we turn to these first.

Section 3.12 of the Bethlehem 1980 Salaried Pension Plan provides in pertinent part:

> Upon application prior to retirement by a participant who would otherwise be entitled to receive a regular pension, the Plan Administrator may make a lump-sum payment to such participant (in lieu of his special payment and his regular pension and the surviving spouse's benefit for which his surviving spouse might otherwise become eligible under paragraph 4.1) in an amount equal to the sum of such special payment and the actuarial value of such regular pension and of such surviving spouse's benefit. A lump-sum payment may be made to such participant only if application therefor is made after applicant has attained the age of 55 years, and if the application is accompanied by evidence, satisfactory to the General Pension Board, of the good health of the participant and the spouse, if any, of the participant.

It is undisputed that plaintiffs here qualified for the lump-sum option in every respect but one: they could not demonstrate that they, their spouses or both were in good health to the satisfaction of the General Pension Board.

The Pension Plan provision relating to the lump-sum option was supplemented by regulations. Those in effect when plaintiffs applied for the lump-sum option provided, *inter alia*, that the request for lump-sum payment be accompanied by a Report of Physical Examination on a form supplied by the Plan Administrator. Both the applicant and his spouse were required to submit the physical examination report. The Administrator or the Board were permitted to request additional information from the applicant with respect to any condition of eligibility. The applications of all but principal officers were first reviewed by the Plan Administrator, who advised the Board, on a monthly basis, of his disposi-

tions. The Plan Administrator submitted the physical examination reports to the Corporate Medical Director for review and was entitled to rely upon his determination of whether or not the applicant and spouse were in good health for the purpose of the lump-sum payment. The applicant was to be notified immediately of the Plan Administrator's decision. If disapproved, the notification was to inform the applicant of the reason(s), of his right to review by the Board and the procedures to be followed in requesting review.

If the reason for disapproval was lack of good health, the Plan Administrator was to arrange for an independent agency to review the Corporate Medical Director's determination that the applicant, his spouse, or both, were not in good health. At all times that this provision was in effect, Aetna Life Insurance Company's Medical Department was the independent agency to which the disapproved applicant's physical examination report was referred. Aetna's determination was deemed satisfactory by the General Pension Board.

When Aetna was selected as the independent reviewing agency, it made available to Bethlehem Steel's Corporate Medical Director its Manual of Medical Selection to use in making the initial determinations of good health. The manual is a standardized system for assessing the health risks of various medical conditions. Aetna relied upon the Manual in making decisions as to the insurability of and rate structure to be applied to its insurance customers. Based upon mortality studies of insured lives, the Aetna Manual assigns "debit points" to certain medical conditions of the person being evaluated and the individual's points are then totaled. For purposes of the lump-sum payment, a total in excess of 150 points resulted in a determination that the applicant was not in good health.

Prior to 1981, the General Pension Board reviewed the Corporate Medical Director's determination that an applicant or spouse or both were not in good health by referring the physical examination reports to a third physician acceptable to both the appli-

cant and the Corporate Medical Director, whose determination was accepted by the Board. (Affidavits of David Kempken in support of defendants' motions for summary judgment.) That procedure was changed when the Board decided, upon the recommendation of David Kempken, Plan Administrator, that a more consistent reviewing procedure was needed. (Deposition of David Kempken at 68.)

Plaintiff Raymond Foulke retired on January 31, 1982. On January 21, 1982, his application for lump-sum payment of his pension benefits was disapproved because both he and his wife were determined not to be in good health for lump-sum payment purposes. The Foulkes appealed and were informed on April 8, 1982, that their medical records had been reviewed by Aetna and that their appeal was denied. (Exhibits B–F, Defendant's Motion for Summary Judgment).

Nazareno Medei applied for a lump-sum payment on December 10, 1981. On January 13, 1982, he was informed that he had been found not in good health. He was notified on February 12, 1982, that Aetna's review also indicated that he was not in good health for lump-sum payment purposes.

Andrew Kavcak's application, dated December 16, 1981, was denied because his wife was determined not to be in good health. After appealing and submitting additional information for Aetna's review, the Kavcaks were informed in June, 1982, that the appeal had been denied.

Raymond Foulke had a history of bladder cancer and stroke. His wife had hypertension. Nazareno Medei's physician indicated on his medical report that Medei was under treatment for a myocardial infarction suffered in February, 1980. Marian Kavcak underwent surgery for cancer of the colon in November, 1980.

All plaintiffs' physicians signed a form provided by Bethlehem Steel indicating that they were in good health, which was defined on the form as follows:

Good health means a state of physical and mental well-being from a medical point of view and includes the absence of a disease or condition that, from a medical standpoint, may result in a significant shortening of life expectancy.

There is nothing to indicate, nor do any plaintiffs argue, that their cases were handled in any way other than by the procedures outlined above. All plaintiffs began and have continued to receive their regular pension benefits after the lump-sum payment was denied.

▮▮▮ Plaintiffs challenge the good health standard as defined and applied by the General Pension Board as a condition for receipt of the lump-sum payment, contending that it is arbitrary, capricious and discriminatory. This, of course, is the only basis upon which a court could review the decision of Trustees charged with administering a pension plan. *Gaines v. The Amalgamated Insurance Fund*, 753 F.2d 288 (3d Cir.1985), *Wolf v. National Shopmen Pension Fund*, 728 F.2d 182 (3d Cir. 1984), *Rosen v. Hotel and Restaurant Employees and Bartenders Union*, 637 F.2d 592, 596, n. 5 (3d Cir.1981). In addition, the Board's interpretation and application of the good health provision in the plan should be upheld unless it is not rationally related to a valid plan purpose or contrary to the plain language of the plan. *See, Gaines, supra*, at 289.

Plaintiffs' arguments are basically twofold. They challenge the Board's definition of good health, contending that, as used, it is not good health in its common sense but expected mortality. Secondly, they contend that whatever the standard, it is not applied uniformly and objectively. Also, underlying plaintiffs' arguments, is the suggestion that any conditions imposed for receipt of the lump-sum option are not rationally related to a valid plan purpose in that the reason given for the good health standard, preservation of plan assets, is faulty in the absence of any allegation that the Plan is experiencing financial difficulty.

▮▮▮ The fiduciary duty placed upon trustees of a pension plan includes the obligation "to preserve the financial security of a pension fund and yet apply the assets to the greatest possible advantage for the beneficiaries. At times, restricting the amounts paid to some may be necessary to prevent loss to others". *Geib, et al. v. New York State Teamsters Conference Pension and Retirement Fund, et al.,* 758 F.2d 973, 978 (3d Cir.1985). David Kempken, representing the General Pension Board, testified at his deposition that the condition of good health imposed upon applicants for the lump-sum form of payment was designed to protect the financial integrity of the Plan. (Deposition of D. Kempken at 50, 51). Plaintiffs have presented nothing to indicate that such was not the reason for the good health standard. It would make little sense to restrict the Board's management of plan assets when such management is designed to prevent financial difficulty, particularly when neither the payment of benefits nor the amount is in issue, but merely a particular form of payment. In *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 512, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402, 410 (1981), the Supreme Court noted that "... [A]n employee's claim to the protected benefit is legally enforceable, but it [ERISA] does not guarantee a particular amount or a method for calculating the benefit". In light of the deference traditionally paid to the decisions of pension fund trustees with respect to the method of calculating benefits and determining amounts to be paid, this Court finds nothing arbitrary or capricious in restricting a particular form of payment. Imposition of the good health standard did not result in the forfeiture of a vested right. Those denied a lump-sum payment thereafter received their regular monthly benefits.

▮▮▮ Keeping in mind that none of the plaintiffs dispute the Board's method for calculating the amount of the lump-sum payment, we next consider whether the Board's use of an expected mortality standard as its definition of good health is arbitrary, capricious or discriminatory. We

note at the outset that the Plan itself defines good health only in terms of the "satisfaction of the General Pension Board". Even if, as plaintiffs contend, the Board's application of the term "good health" is not one that conforms to a layman's usual understanding of it, that does not make it arbitrary or capricious.

As used, the good health standard is rationally related to the calculation of the lump-sum payment as explained by defendants. Section 3.12 of the Plan states that the lump-sum payment is calculated in terms of the actuarial value of applicant's regular pension benefit and that of the surviving spouse. David Kempken testified at his deposition that such value is derived from the life expectancy of the entire group of Bethlehem Steel pensioners. (Kempken Deposition at 48). For each applicant, the Board would determine the regular monthly pension benefit and the number of years the beneficiary and his surviving spouse could be expected to receive it. If a pensioner who received a lump-sum payment or his spouse died before reaching the predicted time of death, they received more in the way of pension benefits than they were entitled to receive, since monthly benefits would terminate upon the death of the pensioner or spouse. The Board sought to limit the number of such "windfalls" by requiring that an applicant for the lump-sum payment demonstrate that the probability of his surviving as long as predicted was not less than average among the group of Bethlehem Steel pensioners. The Board has consistently assessed good health in terms of whether an individual could be expected to demonstrate "average mortality" vis-à-vis the entire group whose mortality experience was the basis for calculating the lump-sum payment. (See Kempken Deposition at 50).

■ Plaintiffs have not countered defendants' assertions that the standard has always been the same, both before and after Aetna was brought into the appeals process.[2] We conclude that defining good health in terms of expected mortality is rationally related to a valid plan purpose and is not arbitrary and capricious.

■ Plaintiffs' final arguments concern the manner of assessing good health/expected mortality by means of Aetna's Manual of Medical Selection. They contend that the use of the "debit point" system, instituted after Aetna was selected as the independent reviewing agency to which all appeals would be referred, so changed the evaluation process that its application to their medical reports caused them to be rejected although they might have been approved prior to the use of the manual. In addition, they argue that the Aetna system did not provide for personal observation and that it was far from uniform and objective. Specifically, plaintiffs note that there was some leeway in assigning points, that point totals were not made a part of applicants' files, that defendants' witnesses were somewhat unsure of the details of using the manual and of the meaning of the points assigned, and that some applicants, rejected initially, were given specific information about possibly helpful additional medical tests while others were not. Plaintiffs contend that the inconsistencies and disparate treatment revealed by discovery indicate that the application of the good health standard was arbitrary and capricious.

According to the uncontested factual averments of defendants made by way of affidavit and deposition, and including deposition exhibits, it is obvious that the Aetna system did not materially change the way good health determinations were made. It was at all times the practice and procedure of the Plan Administrator and the General Pension Board to rely upon the opinion of the Corporate Medical Director as to the good health of applicants for a lump-sum payment of retirement benefits.

2. Raymond Foulke contends in his affidavit that he was never aware that the good health standard was defined in terms of expected mortality, but failed to show how such knowledge on his part would have affected the disposition of his request for a lump-sum payment.

Prior to 1981 when the regulations were changed to include an independent reviewing agency for appeals, Dr. Gilbert Hoffman, one of the physicians on the staff of the Corporate Medical Director, was asked from time to time to evaluate the medical reports submitted by applicants for lump-sum payments. He reported his recommendations to the Corporate Medical Director, who made the final decision as to whether any applicant qualified under the good health standard established by the General Pension Board. (Hoffman Deposition at 9). Dr. Hoffman's purpose in evaluating the medical records submitted by the applicants was to determine whether they contained anything abnormal, *i.e.,* anything that would "curtail their [applicants'] expected longevity". (*Id.* at 71). Thus, even before the Aetna manual with its debit point system was used, no personal examinations were made by the Corporate Medical Director or his staff. At all times the good health determination was made on the basis of information submitted by the applicants. Moreover, as noted, the good health standard was always related to expected mortality.

■ After Aetna was brought into the appeals process, the Corporate Medical Director could use the Manual for Medical Selection to help him make the initial good health determination. This made available to him the same criteria which Aetna would use to review his conclusions, thereby permitting the evaluation of the medical reports to be standardized at all levels. However, nothing in the plan or the revised regulations required the Corporate Medical Director to assign debit points or to rely exclusively upon the Aetna manual in making his good health determinations. Thus, plaintiffs' arguments that point totals were not made a part of the applicants' records, that there is no way to be certain that defendants did assign debit points and did not approve anyone assigned more than 150 debit points, are simply irrelevant. Moreover, on the pending motions for summary judgment, if plaintiffs wish to challenge defendants' factual assertions, they are not permitted simply to aver that there is no independent corroboration of them. Plaintiffs bear the burden of producing specific facts that contradict defendants' version of the facts on this issue. *Bencivenga v. Western Pennsylvania Teamsters and Employers Pension Fund,* 763 F.2d 574 (3d Cir.1985).

Plaintiffs make much of their contention that those principally responsible for the application of the point system were not consistent in their understanding of the meaning of the points and the application of the manual to specific medical reports. Even aside from the fact that the use of the point system was not required, this contention is misleading. Neither David Kempken nor Gilbert Hoffman, whose depositions were cited to support that argument, were actually responsible for making the good health determination.

Kempken was Plan Administrator and as such, technically responsible for determining whether all conditions for the receipt of a lump-sum payment were fulfilled. We reiterate, however, that he was entitled to rely upon the judgment of the Corporate Medical Director as to the good health condition and did so. (Kempken Deposition at 142, 143). Kempken's knowledge of the details in arriving at that decision is, therefore, irrelevant.

Dr. Hoffman did use the Aetna manual to review medical reports at times, but always in collaboration with Dr. Blackburn, who was Corporate Medical Director when Hoffman was allowed to use the Manual, and it was Dr. Blackburn who made the final decision. (Hoffman Deposition at 40).

An aside in the early part of Dr. Hoffman's deposition succinctly summarizes the value to plaintiffs of their contention, even if entirely true, that he exhibited a lack of understanding of the point system and may have come to a different conclusion with respect to the good health of some applicants. In response to several misstatements of his position by counsel for plaintiffs, Dr. Hoffman remarked, "I'm not a director, no. You keep trying to give me a promotion". (Hoffman Deposition at 8).

Plaintiffs have continued to "promote" Dr. Hoffman on the instant motions, but his uncontradicted testimony was that he was never responsible for making the good health determination. His function was always limited to giving advice and making recommendations to the Corporate Medical Director. That being the case, his lack of knowledge as to the correct use or contents of the Aetna Manual when asked, at his deposition, to apply it to certain case files, proves nothing. Plaintiffs have not suggested that anyone who did occupy the position of Corporate Medical Director could not or did not apply the Aetna point system properly or did not know what the points meant.

Plaintiffs' use of the deposition testimony to point out examples of applicants approved prior to the use of the Aetna Manual who would or might not have been approved under the debit point system is also irrelevant to the issue of whether the evaluation system in effect when their applications were considered was arbitrary and capricious. In truth, those examples tend to buttress defendants' contentions that a change in procedures was justified in order to ensure that a lump-sum payment was comparable to receiving a regular, monthly payment of retirement benefits, a valid plan purpose.

There did exist the potential for different results when different physicians and Aetna applied the debit point system to a given medical record. This is hardly surprising, considering that medical conditions are often not susceptible to precise or doubt-free conclusions as to their effect. Doctors may disagree about the emphasis to be placed upon different aspects of any condition, particularly when trying to predict its effect upon life span. Certainly no evaluation of good health can be perfectly precise or objective, especially when that prediction is the goal. Success or failure in an indi-

vidual case can be assessed only after death. The procedures adopted by the General Pension Board attempted to find a consistent, objective method for making good health determinations. Undoubtedly, it was not a perfect method, but neither was it arbitrary and capricious. Only one person at Bethlehem Steel was responsible for making the initial decision, however varied the staff input may have been in a given case. The Corporate Medical Director's conclusion was subject to review, upon request of the rejected applicant, by an independent agency whose expertise in making such determinations went unchallenged by plaintiffs.[3]

Similarly, plaintiffs have not demonstrated that because some applicants received specific information as to certain medical tests, which may have changed the result upon review, while others did not, the latter were denied meaningful review or were treated arbitrarily. In the first instance, all applicants received the same form letter telling them of their right to review, to submit additional information and to have their physicians contact the Corporate Medical Director for the details of their rejection. It is not the fault of defendants if some physicians did so but others did not. Moreover, medical conditions often exist on a continuum and cannot accurately be placed in a discrete category. Additional information may help locate some individuals more precisely in questionable cases but there are surely other cases where the effect on good health/expected mortality of a particular set of medical facts is clear to an experienced evaluator and where no additional information could affect the outcome.

■ In the cases before the Court, none of the plaintiffs has alleged that some particular type of information may have affected the outcome of their determinations.

---

**3.** Plaintiffs Raymond and Alice Foulke alleged in their complaint that Aetna was receiving direct services from the fund and was thus not truly independent. However, they failed to pursue that issue in opposing the motion for summary judgment, while defendants' affidavit in support thereof characterizes Aetna as independent and highly qualified to perform the reviewing function. On this record we are required to accept defendants' characterization as true. *See, Bencivenga, supra.*

The Foulke plaintiffs do not dispute the existence of their medical conditions, nor defendants' assertion that no applicant, such as Raymond Foulke, with a history of stroke within three years of applying for a lump-sum payment was found to be in good health. Mr. Medei does contend that he did not suffer a heart attack, but it was his own physician who included that information on his medical report. As noted previously, the Kavcaks did not respond to the motion for summary judgment. Consequently, all of defendants' factual averments as to them are deemed admitted.

The root of plaintiffs' arguments on these summary judgment motions is their belief that had they appealed an adverse decision of the Corporate Medical Director prior to 1981 they would have received a lump-sum payment. It may be that such belief, although impossible to prove at trial or otherwise, is correct since virtually all determinations referred to a third physician resulted in that doctor's certifying that the applicant was in good health. (Kempken Deposition at 68). In 1981, the General Pension Board determined that such procedures were no longer satisfactory to it and so instituted a different system. That decision and the resulting change cannot be termed arbitrary and capricious simply because some individuals are prevented from reaching a desired goal because of it. Plaintiffs here have demonstrated, at most, that there may have been some mistakes in applying the criteria adopted by defendants for making the good health determination, but not that defendants' handling of lump-sum requests was so inconsistent as to amount to arbitrary and capricious decision-making. They have not countered defendants' assertions that no applicant similarly situated to themselves received a lump-sum payment and so have not been able to show the existence of any material fact for trial.

This Court has concluded that establishing a good health standard was not arbitrary and capricious, that defining it in terms of expected mortality was not arbitrary and capricious and that defendants' application of it to plaintiffs' requests for lump-sum payments was not arbitrary and capricious. Therefore, even after carefully considering the extensive information revealed by discovery in these cases, we find ourselves in agreement with the other courts that have considered this issue and will grant defendants' motions for summary judgment in all three cases. *See, Czyz v. General Pension Board, Bethlehem Steel Corporation,* 578 F.Supp. 126 (W.D. Pa.1983), *Prusak v. Bethlehem 1980 Salaried Pension Plan,* 618 F.Supp. 530 (W.D. N.Y.1984), *Reynolds v. Bethlehem Steel Corp.,* 619 F.Supp. 919 (D.Md.1984).