In re H.R. HINDLE &
CO., INC., Debtor.

MERRILL FARMS CORP., Food Services of America, Inc. d/b/a Amerifresh, Appleland Trading Corporation, Cardinal Distributing Co., Inc., Growers Vegetable Express, Prevor Marketing International, Inc., Produce West, Inc., Sam Perricone Citrus Co., Inc., Seald Sweet Growers, Inc., Suntreat Growers & Shippers, Inc., Plaintiffs,

v.

H.R. HINDLE & CO., INC., Glendale National Bank of New Jersey, Elias Lenard, Defendants.

Bankruptcy No. 92–11755S.

Adv. No. 92–0490S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 13, 1993.

---

Edward E. Cohen, Philadelphia, PA, for debtor & Elias Lenard.

Jeffrey M. Chebot, Owens, Whiteman and Bankes, Philadelphia, PA, Lawrence H. Meuers, Naples, FL, for plaintiffs.

J. Eric Kishbaugh, Voorhees, NJ, for Glendale Nat. Bank of New Jersey.

J. Scott Victor, Philadelphia, PA, for Zambito Producers, Inc. et al.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA, U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION

The instant proceeding represents this court's first extensive encounter with the 1984 amendments to the Perishable Agricultural Commodities Act, 7 U.S.C. § 499e, *et seq.* ("PACA"), which, as amended in 1984, provides that producers of commodities covered by PACA are entitled to a "floating trust" on proceeds of sales of those commodities. Despite our general skepticism of claims that assets of a debtor are the res of a trust, thereby providing a priority to the putative trust beneficiary apart from that established in the Bankruptcy Code, *see, e.g., In re Kulzer Roofing, Inc.*, 139 B.R. 132, 137–38 (Bankr. E.D.Pa.), *aff'd,* 150 B.R. 134 (E.D.Pa.1992), we are compelled to conclude that, in PACA, Congress gave producers of perishable agricultural commodities such a preference. This preference clearly extends to secured creditors as well as general unsecured creditors.

In the instant Motion for Summary Judgment ("the Motion") before us, the Producers argue that they can recover putative PACA trust funds from even a secured lender who argues that it innocently accepted such funds as a so-called bona fide purchaser ("BFP"). We decline the Producers' invitation to declare their powers to be of such overwhelming strength. Therefore, while we conclude, pursuant to Federal Rule of Bankruptcy Procedure

("F.R.B.P.") 7056(d), that all other issues presented in this proceeding can be resolved in favor of the Producers on the Motion, and we have some serious reservations regarding the merits of the secured lender's claim to BFP status, we are unable to totally grant the Motion at this time. A trial, limited only to the issue of the secured lender's BFP status, is therefore necessary.

## B. PROCEDURAL AND FACTUAL HISTORY

On March 25, 1992, H.R. HINDLE & CO., INC. ("the Debtor") filed the instant underlying voluntary Chapter 11 Petition. The Debtor's Schedules recite $697,714.90 in unsecured non-priority claims; $352,-000.00 in secured claims; and assets of approximately $240,000.00. Hence, the Debtor was, on the date of filing, apparently quite insolvent. The Debtor ceased its business operations on March 31, 1992, and is currently engaged mainly in liquidating its assets and collecting outstanding receivables.

Prior to filing bankruptcy, the Debtor was a licensed dealer of perishable agricultural commodities in Philadelphia since 1938. In October, 1986, the Debtor began an extensive loan relationship with GLENDALE NATIONAL BANK OF NEW JERSEY ("Glendale"). To date, the total amount of all loans by Glendale to the Debtor equals $930,000.00, although the balance, as noted, has been reduced to about $350,000 at present. From 1987 to the present, all of Glendale's loans to the Debtor were secured by the Debtor's accounts receivable and inventory.

On November 18, 1992, after notice and a hearing, at which no opposition was raised by any interested party, this court granted the Debtor's motion, pursuant to 11 U.S.C. § 363(b), to sell its principal asset, a unit and a half and its shares as a stockholder at the Philadelphia Fresh Food Terminal, for $120,000.00.[1] The Debtor has also collected approximately $118,000.00 in accounts receivable. These two figures constitute all of the Debtor's present liquid assets.

On November 27, 1992, the Debtor filed a liquidating Plan and an accompanying Disclosure Statement. The Plan contemplates paying all PACA creditors, *i.e.*, the Producers, and other similarly situated creditors, with a pro rata share of designated trust funds (since the claims exceed the funds), and for secured creditors to receive payment from "the liquidation collateral" remaining after payment from the PACA trust (the amount of which, if any, is unclear). After a hearing of December 23, 1992, on the propriety of the Disclosure Statement, in the face of Objections thereto by certain of the Producers and several other similarly-situated parties, the Debtor agreed to file and serve, upon the objecting creditors and certain other designated parties, an Amended Disclosure Statement by January 19, 1993, to which objections could be filed and served by January 25, 1993. The only comment which can be made regarding the relationship of the Plan to the present controversy is that the Plan makes no effort to resolve these issues, or any other priority issues, among the creditors.

Between November, 1991, and March 31, 1992, the Debtor received numerous agricultural commodity transfers from the Producers named as plaintiffs in this proceeding, as well as other producers, without fully paying for them. The facts surrounding each transfer of the Producers is set out in the table below:[2]

---

1. For a full explanation of the workings of the terminal corporation, the reader is directed to our Opinion in *In re Pinto*, 89 B.R. 486, 489–90 (Bankr.E.D.Pa.1988), *modified,* 98 B.R. 200 (Bankr.E.D.Pa.), *rev'd,* C.A. No. 89–3233, 1989 WL 234516 (E.D.Pa. August 23, 1989).

2. This list has been compiled from data supplied by Producers from Exhibit "M" to the Motion.

Exhibit "M" is an uncontested request of the Producers to the Debtor for admissions. Neither Glendale nor the other party defendants, the Debtor and its principal, ELIAS LENARD ("Lenard"), have offered contrary evidence to dispute these transfers in response to the Motion. Therefore, they will be accepted by court as matters of established fact.

| PARTY | AMOUNT OWED | SHIPMENT DATE | DATE OF PACA NOTICE |
|---|---|---|---|
| Amerifresh | $ 5,950.00 | 2/21/92 | 3/27/92 |
| | 10,570.75 | 3/2/92 | 3/27/92 |
| | 10,745.00 | 3/13/92 | 4/20/92 |
| | $ 27,265.75 | Total due | |
| Appleland | $ 4,940.43 | 1/24/92 | 3/3/92 |
| Cardinal | 396.90 | 1/28/92 | 3/6/92 |
| | 814.90 | 1/29/92 | 3/6/92 |
| | 1,265.95 | 2/12/92 | 3/24/92 |
| | 900.90 | 2/12/92 | 3/24/92 |
| | 338.00 | 3/05/92 | 4/14/92 |
| | $ 3,716.65 | Total due | |
| Growers | 2,189.10 | 1/22/92 | 2/26/92 |
| | 1,142.40 | 1/23/92 | 2/27/92 |
| | 2,507.00 | 1/29/92 | 3/05/92 |
| | 638.05 | 1/29/92 | 3/05/92 |
| | 1,509.35 | 2/06/92 | 3/13/92 |
| | 554.05 | 2/08/92 | 3/17/92 |
| | 1,720.20 | 2/13/92 | 3/20/92 |
| | 981.50 | 2/15/92 | 3/24/92 |
| | 2,557.10 | 2/18/92 | 3/25/92 |
| | 660.60 | 2/20/92 | 3/27/92 |
| | 726.60 | 2/26/92 | 4/02/92 |
| | 513.00 | 2/28/92 | 4/07/92 |
| | 359.10 | 3/05/92 | 4/09/92 |
| | $ 16,058.05 | Total due | |
| Merrill Farms | 102.80 | 12/24/91 | 1/23/92 |
| | 5,922.75 | 12/29/91 | " |
| | 1,192.20 | 12/27/91 | " |
| | 1,136.30 | 12/28/91 | " |
| | 6,037.70 | 12/28/91 | " |
| | 4,566.80 | 1/18/91 | 2/11/92 |
| | 3,029.25 | 1/19/91 | 2/14/91 |
| | 3,842.80 | 1/20/92 | " |
| | 2,159.95 | " | " |
| | 3,898.65 | 1/24/92 | 2/19/92 |
| | 3,827.55 | 1/25/92 | " |
| | 4,058.15 | 2/7/92 | 2/25/92 |
| | 4,887.85 | 1/23/92 | 2/28/92 |
| | 1,835.25 | 1/24/92 | " |
| | 4,298.85 | 2/14/92 | 3/5/92 |
| | 4,054.90 | 2/14/92 | " |
| | 3,801.45 | 2/6/92 | 3/13/92 |
| | 2,358.80 | 2/7/92 | " |
| | 4,349.25 | 2/8/92 | 3/19/92 |
| | 3,100.15 | 2/13/92 | " |
| | 4,424.45 | " | " |
| | 1,639.20 | 2/15/92 | 3/30/92 |
| | 3,537.55 | 2/18/92 | " |
| | 1,580.00 | " | " |
| | 4,689.75 | 2/20/92 | " |
| | 991.00 | 2/21/92 | " |
| | 6,962.20 | 2/26/92 | " |
| | 7,180.35 | 2/27/92 | " |
| | 1,624.80 | 2/28/92 | " |

| PARTY | AMOUNT OWED | SHIPMENT DATE | DATE OF PACA NOTICE |
|---|---|---|---|
| | 8,460.25 | 3/4/92 | " |
| | 9,808.55 | 3/5/92 | " |
| | 1,211.20 | 3/6/92 | " |
| | $120,570.70 | Total due | |
| Prevor | 4,678.50 | 11/8/91 | 12/27/92 |
| Produce West | 7,119.55 | 3/11/92 | 4/08/92 |
| Perricone | $ 7,937.50 | 2/08/92 | 3/23/92 |
| | 3,294.50 | 2/21/92 | 3/23/92 |
| | 8,273.50 | 2/28/92 | 3/23/92 |
| | 1,401.30 | 3/02/92 | 3/23/92 |
| | $ 20,906.30 | Total due | |
| Seald Sweet | $ 7,071.50 | 3/13/92 | 3/30/92 [3] |

The total of all of the Producers' transfers to the Debtor which are included within the scope of PACA equals $212,327.93.[4]

On May 12, 1992, the Producers filed the instant adversary proceeding against the Debtor, Glendale, and Lenard.[5] Count I alleges that the inventory and proceeds from the above-listed transfers are all held in a non-segregated "floating" PACA trust and are not property of the Debtor's estate, which can be distributed to the Debtor's other creditors. · Count II alleges a breach of the trust against Lenard, and seeks to reach his personal assets to satisfy this claim. Count III requests that all funds transferred by the Debtor voluntarily or involuntarily to Glendale after November 11, 1992, be held in trust for the exclusive benefit of the Producers and that Glendale should be ordered to turn over all such funds previously received by it to the Producers. In the Producers' instant Motion for Summary Judgment, they have narrowed their request against Glendale to a sum of $58,086.00 allegedly set off by Glendale from the Debtor's bank account on March 23, 1992, just two days before the Debtor's bankruptcy filing.

Glendale answered the Complaint on June 15, 1992. In addition to denying the Complaint's averments, Glendale alleged that the Producers failed to comply with the requirements for creation of PACA trusts and that, therefore, as to them, the Complaint should be dismissed. Neither the Debtor nor Lenard filed any responsive pleadings.

The trial of the Proceeding was originally scheduled on July 15, 1992, and continued by agreement of all parties to, first,

3. There is no information provided regarding any transfers covered by the PACA amendment to the Debtor from Suntreat. We do note that, in the Complaint, the Producers request $23,-724.50 for produce transferred between December 11, 1991, and December 20, 1991, to the Debtor from this party.

4. The Complaint recites the figure due as $218,-463.13. It includes a lower figure ($100,209.28) for Merrill Farms, a slightly higher figure ($17,-524.10) for Growers, and includes the $23,-724.50 claim due by Suntreat. *But see* n. 3 *supra.*
This figure can also be compared to the total sum of $340,634.13 which the United States Department of Agriculture recognized, on June 29,

1992, as qualified for trust protection, to be held in a CoreStates First Pennsylvania account for distribution to a total of twenty-eight (28) unpaid PACA creditors. *See* Exhibit "S" to the Motion.

5. The instant proceeding was preceded by another adversary proceeding, Adv. No. 92–0411S, initiated against the Debtor only by four other alleged PACA creditors. Glendale is not a party to that suit. This other proceeding was reported settled without a trial on November 18, 1992, although we note that the parties requested an extension until January 14, 1993, to file a formal settlement stipulation motion. This is similar to the status of the instant Producers' claims against the Debtor. *See* pages 781–782 *infra.*

September 16, 1992, and, then, November 18, 1992. On the latter date, the Debtor and Lenard announced that they had entered into a settlement with the Producers, pursuant to which those defendants were willing to grant the Producers certain relief. We note, however, that no Stipulation memorializing that settlement had appeared to date and that the parties requested and were granted an extension until January 13, 1993, to tender their settlement stipulation to the court.

This court initially expressed reluctance to continue the trial of the Producers' claims against Glendale beyond the November 18, 1992, date. Ultimately, in light of the Producers' expressed intention to promptly present the instant Motion in lieu of trial and to have the trial conducted on a must-be-heard basis on January 14, 1993, if the Motion were unsuccessful, we agreed to one further continuance. The foregoing trial-schedule was memorialized in our Order of November 19, 1992, as well as the agreement of the Producers and Glendale to prepare the Motion and supporting Brief, and any responsive pleadings and Brief, by December 11, 1992, and December 18, 1992, respectively.

The Producers' Motion, accompanied by an Affidavit of its counsel summarizing the remaining exhibits, which were mostly copies of responses to written interrogatories, requests for production of documents, and requests for admissions, was timely filed. Glendale's response did not appear on December 18, 1992, or shortly thereafter. Our attempts to contact Glendale's counsel ultimately yielded a claim that he did not receive our Order of November 19, 1992, although court records indicate that the Order was promptly mailed to counsel by both the court's personal secretary and the Clerk's Office. A short responsive Brief, attaching only a copy of its answers to the Producers' interrogatories to it, which were already part of the exhibits to the Producers' Motion, finally appeared on December 29, 1992.

On January 4, 1993, the first day after the year-end holidays, the Producers requested permission to file a Reply Brief. We allowed this filing only on the condition that Glendale did not object and that this filing would be accomplished no later than January 7, 1993. The Reply Brief appeared on January 6, 1993. However, the delays in Glendale's filing and in this unanticipated additional filing frustrated the court's intention to have the briefing completed several weeks prior to trial, in order that we could decide and apprise the parties regarding the necessity for trial and/or the court's perception of the issues presented prior to trial. These delays, which were of the parties' own making, pinch the time of the court to respond to the Motion to less than a week, and preclude our apprising the parties of the disposition of the Motion until the day before the trial. This is unfortunate, but, since the delays were of the parties' own making, they can rest assured that no further continuance of the trial will be forthcoming.

C. DISCUSSION

1. THE PRODUCERS HAD THE BURDEN, ON THIS MOTION, OF ESTABLISHING THEIR ENTITLEMENT TO JUDGMENT AS A MATTER OF LAW, ALTHOUGH THEY ARE ENTITLED TO RESOLUTION IN THEIR FAVOR OF ALL FACTUAL ISSUES NOT CONTESTED BY GLENDALE'S RESPONSE TO THE MOTION.

The Producers' instant Motion for Summary Judgment is filed pursuant to F.R.B.P. 7056, which incorporates F.R.Civ.P. 56 in its entirety, including F.R.Civ.P. 56(a), which authorizes a claimant to file such a motion. F.R.Civ.P. 56(c) provides that

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no issue of any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court views summary judgment "not as an disfavorable shortcut, but rather as an integral part of the Federal rules as a whole, which were designed 'to secure the just, speedy and inexpensive

determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986), quoting F.R.Civ.P. 1. This court has nevertheless been cautious to grant such relief due to the drastic nature of the remedy of providing relief without the normal opportunity for trial, *see In re Jackson*, 92 B.R. 987, 990 (Bankr.E.D.Pa.1988), citing *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3rd Cir.1981). We have noted that the movant bears a substantial burden in proving that there is no genuine issue of any material facts. *Jackson, supra*, 92 B.R. at 990, citing J. MOORE, MANUAL OF FEDERAL PRACTICE AND PROCEDURE, § 1710[3] (1987 ed.). Furthermore, this court must examine the facts in a light most favorable to the party opposing the motion. *See United States v. Hubler*, 117 B.R. 160, 162 (Bankr.W.D.Pa.1990), *aff'd*, 928 F.2d 1131 (3rd Cir.1991), citing *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946, 949 (3rd Cir. 1990).

■ A fact is "material" if it would affect the outcome of the suit as determined by the substantive law. *See Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3rd Cir.1992), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, in opposing such a motion, the nonmoving party is not entitled to stand on its pleadings. *See* F.R.Civ.P. 56(e); and J. MOORE, FEDERAL PRACTICE, ¶ 56.11[3], at 56–113 to 56–114 (2d ed. 1993), or upon general denials to specific factual averments which the moving party has asserted in support of its motion. *Anderson, supra*. Therefore, as articulated in *Gray*, while the facts must be viewed in a light most favorable to the nonmoving party and all inferences must be drawn in that party's favor, a court will not be inclined to conclude that there is no issue for trial unless there are such significant facts established in affidavits, pleadings, and discovery favoring the nonmoving party that a jury could conceivably return a verdict for that party. 957 F.2d at 1078. *See also Coleman v. Ramada Hotel Operating Co.*, 933 F.2d 470 (7th Cir.1991); and *In re Kenston Management Co., Inc.*, 137 B.R. 100, 108 (Bankr. E.D.N.Y.1992).

■ Hence, although the nonmovant enjoys the lesser burden of merely rebutting the movant's attempts to prove that no genuine issues of any material facts exist, the nonmovant still has a significant burden of proving that genuine, material issues of fact *do* exist. *See Byrnes v. Herion, Inc.*, 757 F.Supp. 648, 651 (W.D.Pa. 1990), citing *Anderson, supra*, 477 U.S. at 248, 106 S.Ct. at 2510. As a result, when a party files a motion for summary judgment, the opposing party is under an obligation to respond to that motion in a timely fashion and to place before the court, in appropriate fashion, all materials which it wishes the court to consider when it rules on the motion. *See Cowgill v. Raymark Industries, Inc.*, 780 F.2d 324, 329 (3rd Cir.1985). The nonmoving party has an obligation to do more than simply show that there is some "metaphysical doubt" as to the material facts. *See Matsushita Electric Industrial Co. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ Failure to timely respond to a motion for summary judgment, as Glendale initially did, can itself justify the granting of the motion. *See* F.R.Civ.P. 56(e); and *Medei v. Bethlehem Steel Corp.*, 617 F.Supp. 372, 374 (E.D.Pa.1985). However, even where the nonmovant fails to make a proper response, summary judgment is appropriate only to the extent that the movant has carried its burdens and has affirmatively demonstrated both the absence of any genuine issue of material fact and that the law requires a judgment in its favor. *See SEC v. Spence & Green Chemical Co.*, 612 F.2d 896 (5th Cir.1980), *cert. denied*, 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981).

2. THE 1984 AMENDMENTS TO PACA ESTABLISH A "FLOATING TRUST" IN FAVOR OF PRODUCERS OF GOODS WITHIN ITS SCOPE WHO FOLLOW ITS DIRECTIVES, THEREBY CREATING AN OVERRIDING PRIORITY FOR SUCH CLAIMS.

■ PACA was enacted in 1930 to regulate the shipment and handling of perisha-

ble agricultural commodities. *See, e.g., Frio Ice, S.A. v. Sunfruit, Inc.,* 918 F.2d 154, 155–56 (11th Cir.1990); and *In re Richmond Produce Co.,* 112 B.R. 364, 368 (Bankr.N.D.Cal.1990). In 1984, Congress amended PACA significantly by adding to 7 U.S.C. § 499e provisions which create a statutory trust for the benefit of the agricultural producers when their inventory is transferred to any type of produce dealer. *See, e.g., Frio, supra,* 918 F.2d at 156; *Richmond Produce, supra,* 112 B.R. at 368; *In re W.L. Bradley Co.,* 75 B.R. 505, 508–09 (Bankr.E.D.Pa.1987); and *In re Fresh Approach, Inc.,* 51 B.R. 412, 414 (Bankr.N.D.Tex.1985). Thus, 7 U.S.C. § 499e(c)(2) provides in pertinent part that

[p]erishable agricultural commodities received by a commissioned merchant, dealer, or broker in all transactions, and all inventory of food or other products derived from perishable agricultural commodities, and any receivables of proceeds from the sale of such commodities of products, shall be held by such commissioned merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transactions, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents ...

The 1984 amendments to PACA clearly attempted, in an ironclad manner, to protect the agricultural commodities industries from delinquent payment or nonpayment by wholesalers by creating a trust on behalf of the producers, in the same manner that has been provided by amendments to the Packers and Stockyards Act, 7 U.S.C. § 196, *et seq.* ("the PSA"), adopted in 1976. *See* H.REP. No. 98–543, 98th Cong., 1st Sess. 3, 4 (1983), U.S.Code Cong. & Admin.News 1984, 406–07 ("House Report").

An unusual, we might say extraordinary, aspect of a PACA trust arises from Regulations which indicate that the producer-beneficiaries of a PACA trust do not have to trace their assets in the trustee-dealer's hands to cause the trust to remain effective. In this regard, 7 C.F.R. § 46.46(c) provides as follows:

*Trust assets.* The trust is made up of perishable agricultural commodities received in all transactions, in all inventory of food or other products derived from such perishable agricultural commodities, and all such receivables or proceeds from the sale of such commodities and food or products derived therefrom. *Trust assets are to be preserved as a nonsegregated "floating" trust. Commingling of trust assets is contemplated* (emphasis added).

The PACA trust fund therefore hovers over not only the debtor's perishable commodities, but also products made from them and the accounts receivable and proceeds from them. *See* House Report at 4–5; and *In re Monterey House, Inc.,* 71 B.R. 244, 246 (Bankr.S.D.Tex.1986). The term "floating" extends the trust to all produce-related inventory, receivables, and proceeds of the debtor-dealer, regardless of origin or destination, to satisfy a PACA trust res. *See* House Report at 5; and *Fresh Approach, supra,* 51 B.R. at 422. Thus, once the producer establishes its PACA trust-beneficiary status, it has no obligation to trace the assets to specific funds, and prevails as long as it establishes that proceeds of its assets have come into the hands of a buyer. *See Bradley, supra,* 75 B.R. at 509.

Attempts by creditors to establish priorities for themselves by asserting their status as that of trust beneficiaries are phenomena which are quite familiar to us. In *Kulzer Roofing, supra,* 139 B.R. at 137–39, we expressed our aversion to such efforts of creditors to create priorities in bankruptcy for themselves. *See also In re Miller's Auto Supplies, Inc.,* 93 B.R. 344 (Bankr. E.D.Pa.1988); *In re Temp–Way Corp.,* 82 B.R. 747, 753 (Bankr.E.D.Pa.1988); and *In re American Int'l Airways, Inc.,* 70 B.R. 102, 103 (Bankr.E.D.Pa.1987).

In *Kulzer Roofing,* 139 B.R. at 138–39, we were compelled to concede that, in *Begier v. Internal Revenue Service,* 496 U.S. 53, 60–67, 110 S.Ct. 2258, 2263–67, 110 L.Ed.2d 46 (1990), the Court rejected our holding that a claim of the Internal Reve-

nue Service ("the IRS") for unpaid withholding taxes was not entitled to a trust res status which put it beyond the reach of a preference action when the debtor had not segregated the funds payable on these taxes. However, we pointed out in *Kulzer Roofing* that the language of *Begier,* 496 U.S. at 58, 110 S.Ct. at 2262, reinforced the "central policy" of "[e]quality of distribution among creditors" under the Bankruptcy Code. 139 B.R. at 138. We noted also in *Kulzer Roofing* that the *Begier* result was justified only by the unique coalescence of several factors, notably a federal statute which expressly created a trust fund entitling the beneficiary to priority treatment, legislative history supporting such preferential treatment, and the beneficiary's ability to trace the funds of the trust res. *Id.*

Here, there is a similar coalescence of the elements which we found critical to the result in *Begier,* and absent as to the union benefit funds at issue in *Kulzer Roofing. Id.* at 138–39. There is a federal statute which gives PACA trust creditors a priority over all other creditors. Legislative history supports Congress' intention to give these parties an almost unconditional priority. The concept of a "floating trust" eliminates the tracing requirement.

█ The PACA trust is therefore extremely potent in its ability to affect distribution in bankruptcy. It effectively provides its beneficiaries with a claim status that trumps that of all other creditors, even secured creditors. *See, e.g., Continental Fruit Co. v. Thomas J. Gatziolis & Co.,* 774 F.Supp. 449, 451 (N.D.Ill.1991); *In re Southland & Keystone,* 132 B.R. 632, 636 (Bankr. 9th Cir.1991); *In re Super Spud, Inc.,* 77 B.R. 930 (Bankr.M.D.Fla.1987); and *In re Prange Foods Corp.,* 63 B.R. 211 (Bankr.W.D.Mich.1986).

The wisdom behind the policy of such prophylactic statutes, which can be likened to the "special interest" provisions in the Code protecting groups as diverse as fishermen, pensioners, and lessors of aircraft, can be questioned. Every special-interest protection not only undermines the rights ·of general unsecured creditors, but also the

concept of a unitary, self-contained Bankruptcy Code. We can appreciate that producers of perishable agricultural commodities can be financially devastated by a buyer's bankruptcy case. However, bankruptcies are often devastating to a debtor's unpaid creditors. They may be devastating to a secured or unsecured creditor of a produce dealer as well. However, only producers and a few other types of creditors are entitled to a favored treatment. The impact of the PACA amendments has therefore been appropriately described as "Draconian" and has been subjected to strict construction against producers. *In re D.K.M.B., Inc.,* 95 B.R. 774, 779 (Bankr. D.Colo.1989). This observation causes us to respect the rights of PACA trust creditors, but to view any compromise of their rights, contrary to what the Producers suggest, *see* pages 788–789 *infra,* as something less than inequitable or catastrophic.

█ In order for the PACA statutory trust to operate in favor of a producer of agricultural commodities, that producer must file notice of its intention to preserve trust status within the time dictated in the pertinent provisions of the Code of Federal Regulations. The applicable regulation. 7 C.F.R. § 46.46(g)(1), provides as follows:

> Notice of intent to preserve the benefits under the trust must be in writing, given to the debtor, and filed with the Secretary within 30 calendar days:
>
> (i) After expiration of the time prescribed by which payment must be made pursuant to the regulation,
>
> (ii) After expiration of such other time by which payment must be made as the parties have expressly agreed to in writing before entering into the transaction, but not longer than [30 days after receipt and acceptance of the commodities], ...

█ Once the notice requirement is satisfied, the trust is created and attaches to all of the buyer's related produce and proceeds therefrom, regardless of the source of said inventory. *See Bradley, supra,* 75 B.R. at 509. We note that the issue of whether or not a proper notice to create a PACA trust was dispatched by the produc-

ers in question is by far the most common issue litigated in the reported cases involving PACA trusts. *See In re East Coast Brokers & Packers, Inc.*, 961 F.2d 1543 (11th Cir.1992); *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777 (8th Cir.1991); *Richmond Produce, supra,* 112 B.R. at 369–76; and *Bradley, supra,* 75 B.R. at 511–13.

### 3. GLENDALE HAS FAILED TO PRESERVE ANY DEFENSE EXCEPT ITS ALLEGED RECEIPT OF THE PAYMENTS IN ISSUE AS A BFP.

Glendale's Answer to the Producers' Complaint alleged that the Producers had not met their statutory burden of preserving their trust beneficiary status by, *inter alia,* giving proper notice. The court will address this issue, although Glendale may have waived this defense by neglecting it in its response to the Motion. *See* F.R.Civ.P. 56(e).

In order to preserve their trust status, the Producers were obliged to notify the Secretary of the United States Department of Agriculture ("the Secretary") and the Debtor of their intentions. 7 C.F.R. § 46.46(g)(3) addresses the notice requirement mandated in 7 U.S.C. § 499e(c)(3) and provides in pertinent part as follows:

> An appropriate notice of intent to preserve trust benefits must be in writing, must include the statement that it is a notice of intent to preserve trust benefits, and must include information which establishes for each shipment:
>
> (i) The name and address of the trust beneficiary, seller-supplier, commission merchant, or agent and the debtor as applicable,
>
> (ii) The date of the transaction, commodity, contract terms, invoice, price, and the date payment was due,
>
> . . .
>
> (iv) The amount unpaid and past due.

Upon review of the notices supplied by the Producers, this court finds that the transfers listed at pages 780–781 *supra* were properly documented and forwarded to the Debtor and to the Secretary. Each notice contained the name of the supplier,

dates of the transfers, the commodities transferred, the contract terms, the payment terms, the amount owed and in default, and the date that the trust notices were sent.

In its response to the instant Motion, Glendale was obliged to produce affidavits or specific references to discovery or pleadings if it wished to raise any issues surrounding those presented by the Producers on this issue in its Motion and attachments. It failed to do so. Hence, this court finds the Producers (except Suntreat, see page 781 n. 3 *supra*) have satisfied their statutory notice requirements and have preserved their respective trust beneficiary statuses against the Debtor and Glendale. We will therefore grant the Producers' Motion, pursuant to F.R.Civ.P. 56(d), as to the issue of whether the Producers have valid PACA trust claims. We hold that they do, and that this fact provides them with a right to recover the funds paid to Glendale, *see Richmond Produce, supra,* 112 B.R. at 376–78, unless Glendale can establish that it accepted the trust funds as a BFP. *See* pages 786–789 *infra.*

### 4. THE INSTANT RECORD DOES NOT RULE OUT GLENDALE'S ONLY ARTICULATED DEFENSE: THAT IT CAN PROVE THAT IT WAS A BFP OF THE TRUST ASSETS.

The only issue raised by Glendale in opposition to the Motion is that it was a "bona fide purchaser" of the $58,086 which it received from the Debtor on March 23, 1992, citing *C.H. Robinson Co. v. Trust Co. Bank, N.A.,* 952 F.2d 1311, 1313–16 (11th Cir.1992), as its sole legal authority. The Producers respond, principally by attacking the *Robinson* decision as contrary to the spirit and underlying purposes of PACA and a just target of (unsuccessful) corrective legislation. In their Reply Brief, the Producers also argue that the instant facts can be distinguished from those of *Robinson* on the ground that Glendale had at least constructive knowledge of the trust simply because of the presence of the

PACA amendments and because Glendale obtained the funds from the Debtor by means of a setoff rather than a payment to it by the Debtor.

We find that *Robinson* is a correct statement of the applicable law and that, even as presented by the Producers in their Motion, it allows for differences in the facts which could be material to the outcome of the Producers' claims against Glendale. In support of this conclusion, we turn to the record to ascertain what facts have been established.

The facts are disputed as to exactly how Glendale obtained the funds from Hindle. The Producers maintain that Glendale never met with the Debtor or Lenard and that neither Lenard nor any other agent of the Debtor ever consented to the setoff from its account. To support this affirmation, the Producers supplied the court with the answers by Lenard and the Debtor to interrogatories propounded to them by the Producers. These answers state that no meeting took place between the Debtor and Glendale anytime prior to March 23, 1992, and that therefore Glendale unilaterally set off its claim against the Debtor's account. *See* Exhibits "O" and "P," Question/Response ¶ 12; and Exhibits "Q" and "R," Question/Response ¶ 8).

Glendale notes, however, that its own discovery responses offer the court completely opposite contentions regarding the circumstances under which the Debtor transferred the disputed funds to it. In its Response to Plaintiffs' Interrogatories, Glendale stated that Lenard met certain of its executives several days prior to March 23, 1992, and invited it to set off its claims against the Debtor's business account. *See* Exhibits "U" and "V," Questions/Responses, ¶s 6, 11. Glendale also argues that it could not have set off its claims against the Debtor's bank account unilaterally because the Debtor was not at that time in default of any loan obligations. In fact, Glendale states that the Debtor's loan payments "were current, with excellent payment history until after March, 1992." *See* Exhibit "V," ¶ 9. Therefore, it argues that, under the loan agreements between it and the Debtor, it had no contractual right to unilaterally set off its claims at that time against the Debtor's account with it.

The *Robinson* court had before it an appeal by PACA producers from a district court decision regarding priorities of PACA trust funds which granted summary judgment to a secured lender of a buyer-debtor and partial summary judgment to an unsecured lender of the debtor to the extent that it found that the lenders did not have actual knowledge of the PACA trust nor a security interest in trust assets. *Robinson, supra,* 952 F.2d at 1313; and *C.H. Robinson Co. v. B.H. Produce Co.,* 723 F.Supp. 785, 793 (N.D.Ga.1989).

Although affirming the result of the district court's decision, the *Robinson* court applied several general trust law principles and concluded that the district court's decision had been, if anything, too generous to the PACA producers in two respects: (1) the creditors could take property free of the trust if they established lack of knowledge of *breach* of the trust, not just lack of knowledge that the trust existed; and (2) there was no basis for drawing a distinction between secured and unsecured lenders. 952 F.2d at 1314. The court expressly rejected the notion that the mere enactment of the PACA amendments established constructive knowledge of trust by the creditors, holding that statements arguably to the contrary in a PSA case, *In re Gotham Provision Co.,* 669 F.2d 1000, 1001 (5th Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 129, 74 L.Ed.2d 111 (1982), were taken out of context. *Robinson, supra,* 952 F.2d at 1315.

We believe that the *Robinson* court correctly applied general principles of trust law. Finding no pertinent Pennsylvania caselaw, we turn to The RESTATEMENT (SECOND) OF TRUSTS, § 284(1), at 47–48 (1959) ("the Restatement"), which provides that,

> [i]f the trustee in breach of trust transfers trust property to ... a person who takes for value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction, the latter holds the interest so trans-

ferred or created free of the trust, and is under no liability to the beneficiary.

Thus, if Glendale is able to prove that Debtor transferred the trust assets, (1) for value, and (2) without its actual or constructive notice of the breach of the trust, it could have attained "bona fide purchaser" status, *see* Restatement, *supra*, § 284(2), at 48, and judgment could conceivably be granted in its favor.

We reject the Producers' arguments that *Robinson* is an aberrant decision whose principles should not be followed by this court because they would undermine the public policy which led to the enactment of the 1984 PACA amendments. We note that reasoning similar to that of *Robinson* has been adopted by all of the prior cases which we could locate which have been confronted with this issue. For example, in *Lyng v. JDC Enterprises*, 117 B.R. 268 (S.D.Tex.1990), the court adopted the rationale that an innocent third-party transferee is protected from an attack by the Secretary in his attempt to recover PACA trust funds. In *Lyng*, the court granted the defendant bank's motion for summary judgment to dismiss the complaint because the bank's proof clearly showed it had no knowledge that loan payments were being made from PACA trust funds and no knowledge that the debtor ever failed to pay for any produce it received. In support of its decision, the *Lyng* court cited *In re Harmon*, 11 B.R. 162 (Bankr.N.D.Tex. 1980), a PSA case; and dicta in *In re Tanner*, 77 B.R. 897, 901 n. 9 (Bankr. N.D.Ala.1987); and *In re Al Nagelberg & Co.*, 84 B.R. 19, 21 (Bankr.S.D.N.Y.1988).

In *Harmon*, 11 B.R. at 166–67, the court allowed a livestock supplier to recover only a portion of a retainer paid to the debtor's attorney from PSA trust funds. All funds which the attorney consumed prior to learning of the statutory trust were determined to be his to keep. *Id.* The attorney was required to return only those funds not consumed by fees once he learned that a PSA trust existed. *Id.* at 167. The pivotal date to the court was the date when the attorney learned of the trust. *Id.* The *Robinson* court would, we think, correctly amend this holding to state that the signifi-

cant issue should have been when the attorney learned or should have learned of the breach of the trust by his client.

In *Tanner*, the court indicated that it would have ruled in a manner similar to *Harmon* but for its lack of subject matter jurisdiction to hear the controversy before it. In dicta, the *Tanner* court proffered the interesting observation, consistent with the result in *Robinson*, that monies paid by a trustee-debtor to creditors in the ordinary course of business, such as utility suppliers or even taxing authorities like the IRS to whom payments are made could be ordered to return all payments made to them under a broad interpretation of the scope of the PACA Trust. The court in *Nagelberg*, *supra*, 84 B.R. at 21, merely acknowledged in dictum that "it might be impossible to recover trust monies paid … from a *bona fide* purchaser for value."

*Richmond Produce*, *supra*, 112 B.R. at 376–78, also discusses the BFP issue. It declines to accept the defendant bank's argument that mere ignorance of the existence of PACA and its effects is a valid defense. *Id.* at 378. However, the court relied heavily upon the district court decision in *Robinson*, the reasoning of which was disapproved in part by the Court of Appeals.

 This court is not impressed with the Producers' suggestion that the reasoning of the *Robinson* case is contrary to public policy. The PACA trust amendments, as noted in our discussion at page 785 *supra*, already provide producers with extraordinary protections. Congress chose to use a trust device to do so. The producers must accept the limitations on their rights which arise under the common law relative to trusts. The concept of a "floating trust" is in itself a significant departure from common law trust principles because it eliminates the tracing requirement. This court is extremely reluctant to provide additional protections to producers beyond those extraordinary and perhaps excessive ones which Congress has already provided. We understand the importance to producers of this special interest legislation in

their favor. However, we would be extremely loath to encourage an interpretation of the PACA amendments which would jeopardize "ordinary course" creditors, as noted in *Tanner, supra.* As we noted at page 785 *supra*, other creditors of agricultural dealers also suffer when such entities become bankrupt. We see no reason why producers should *always* prevail over *all* other creditors of dealers, irrespective of the circumstances.

All of this is not put forward to suggest that Glendale is a particularly appealing third-party creditor. We agree with *Richmond Produce* that a creditor's mere subjective ignorance of the intricacies and workings of the PACA trust amendments and their consequences is not a complete defense to a claim that funds received are part of a trust res. It is against public policy to promulgate ignorance, particularly from presumably sophisticated lenders like Glendale, which had a lending relationship with the Debtor for six years prior to the events in issue and would presumably know the nature of its business and should have been conversant with laws pertinent to its rights. On the other hand, to argue that because the PACA trust amendments exist, all creditors are charged with constructive knowledge of their presence and effect would be to reason the viable general trust principles which *Robinson* properly invokes out of existence and provide PACA producers with a priority against all parties, even ordinary-course creditors, which would be unassailable in any circumstances, irrespective of the equities.

We conclude that Glendale must, first, prove that it neither knew nor had reason to know that the funds which it obtained on March 23, 1992, were trust funds and that their seizure would be violative of the PACA trust amendments. Also, it has the burden of proving that its seizure of the funds in issue was "for value," *i.e.,* that there was adequate consideration therefor.

The fact that Glendale effected a setoff from the Debtor just two days before its bankruptcy filing, and prior to any default and hence any contractual right to do so, would not appear to support Glendale's legal position or equities, as it appears to argue. The possibly important issue of whether the Debtor authorized this setoff or not is disputed. It is difficult for us to see why this transfer would not be subject to avoidance as a preference, pursuant to 11 U.S.C. § 547, in any event, and hence it is somewhat puzzling as to how and why Glendale believes that it has a significant prospect of its retaining this payment.

Glendale may also be unable to prove that its setoff of the funds in issue was "for value." There is little doubt that Glendale was (and is) owed significant sums by the Debtor. However, we question whether a setoff effected prior to a default meets the requirements of "value" under the law of trusts. If Glendale acted without the Debtor's permission, in violation of the parties' contract, it could hardly argue that it provided due consideration for its actions. Even if it acted on the basis of Lenard's permission, given to serve his own interests in his relationship with Glendale, it would appear difficult to argue that the *Debtor* received fair consideration for the transfer. *See also* Restatement, *supra*, §§ 323(2), 324 & comment i, at 115, 117–18, 121.

Therefore, Glendale's defenses, even in light of the decision in *Robinson* and its progeny, do not seem particularly strong. However, we do not think that their rejection can be made simply on the basis of the applicable law and the rather ambivalent facts established in the Motion and its supporting documents. Glendale should, of course, carefully consider whether litigating this defense, in light of our observations made out herein, is economically prudent.

### D. CONCLUSION

For the reasons stated above, summary judgment will be granted to the Producers on all issues except whether Glendale has a viable BFP defense to its claim, *i.e.,* on the issue of the validity of most of their PACA trusts as to the funds in issue. A trial on

that outstanding issue only will remain scheduled on the previously-designated date of January 14, 1993, on a must-be-heard basis. We do advise counsel that court will convene at 12:00 Noon that date instead of at 9:30 A.M., as had been recited in our Order of November 19, 1992.