In re Thomas U. SNYDER, Debtor.

N.P. DEOUDES, INC.; Tony Vitrano Co.; W. Deemer Class & Son; Sid Goodman & Co., Inc.; Royal Tomato Co., Inc.; and Sol Salins, Inc., Plaintiffs,

v.

Thomas U. SNYDER, Defendant.

Bankruptcy No. 93–13092.

Adv. No. 93–1575.

United States Bankruptcy Court,
D. Maryland.

Aug. 26, 1994.

trative expenses have been paid, they shall not be paid twice.

S.P. McCarron and L.W. Diess, III of McCarron & Associates, Washington, DC, for plaintiffs.

S.S. Bleecker of Bleecker & Bleecker, Rockville, MD, for Thomas U. Snyder, debtor.

### MEMORANDUM OF DECISION DENYING SUMMARY JUDGMENT TO PLAINTIFFS AND DISMISSING DISCHARGEABILITY COMPLAINT

FRANCIS G. CONRAD, Bankruptcy Judge.[*]

Plaintiffs' Motion for Summary Judgment requires us to decide [1] whether the so-called

---

[*] Sitting by special designation to the District of Maryland.

1. We have jurisdiction over this matter under 28 U.S.C. § 1334(b) and the general reference to

"trust" impressed upon the assets of buyers of fruits and vegetables by § 499e of the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. § 499a-t, creates a fiduciary obligation that may be nondischargeable under § 523(a)(4)[2] of the Bankruptcy Code. We hold, for reasons that follow, that (1) Plaintiffs are not entitled to summary judgment even if PACA creates a fiduciary obligation because material facts remain in issue as to whether they properly perfected their beneficial interests; and (2) a PACA debtor does not serve PACA trust beneficiaries in a fiduciary capacity for purposes of § 523(a)(4). Accordingly, we will deny Plaintiffs' motion for summary judgment, grant summary judgment to Debtor, and dismiss this adversary proceeding.

## FACTUAL AND PROCEDURAL BACKGROUND

Debtor was an officer, director, and 50 percent shareholder of Ex–Sell, Inc., a Maryland corporation licensed to buy and sell fruits and vegetables as a dealer and commission merchant under PACA. Plaintiffs sold to Ex–Sell assorted produce for which they were never paid with an aggregate value of $262,641.01. Plaintiffs brought this adversary proceeding seeking a determination that Debtor is liable for his corporation's debt, and that the debt is nondischargeable under § 523(a)(4)[3] of the Bankruptcy Code.

Plaintiffs' theory of liability has three links. They assert first that 7 U.S.C.

§ 499e(c)(2) creates a trust in which Ex–Sell held all produce conveyed to Ex–Sell and all products, proceeds, and receivables therefrom for the benefit of Plaintiffs. Next, Plaintiffs contend that Debtor, as an officer, director and shareholder of Ex–Sell, owed a fiduciary duty to Plaintiffs to preserve trust assets and pay them over to Plaintiffs. Finally, Plaintiffs contend that their empty hands, without any other allegation of impropriety or misconduct by Debtor, establishes a "defalcation while acting in a fiduciary capacity" by Debtor that is nondischargeable under § 523(a)(4).

Debtor offers multiple objections to Plaintiffs' motion.

— A genuine issue of material fact exists with respect to whether Plaintiffs properly perfected their interests in the trust assets by complying with the notice provisions of 7 U.S.C. § 499e(c)(3).

— As a statutory creation, a PACA trust cannot give rise to the kind of fiduciary relationship protected by § 523(a)(4).

— "Defalcation" within the meaning of § 523(a)(4) requires some affirmative misconduct. Mere failure to pay is insufficient to make the debt nondischargeable.

— Plaintiffs have alleged no basis for holding Debtor personally liable for Ex–Sell's failure to pay.

Our resolution of Debtor's first two objections makes it unnecessary for us to reach the two remaining.[4]

this Court under Maryland District Court Local Rule 402. This is a core matter under 28 U.S.C. §§ 157(b)(2)(A), (I), and (O).

2. All statutory references are to Title 11 of the United States Code unless otherwise specifically noted.

3. Section 523(a)(4) provides, in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
. . . .

4. Although we do not reach the issue, our preliminary exploration of whether "defalcation" requires affirmative misconduct turned up a stone hitherto unflung in the conflict among courts which have dealt with the issue. *Compare Fidelity and Deposit Company of Maryland v. Martin (In re Martin)*, 161 B.R. 672, 678 (9th Cir. BAP 1993) ("defalcation" requires "a showing of some element of bad faith or reprehensible conduct"); *First State Insurance Co. v. Bryant (In re Bryant)*, 147 B.R. 507, 511 (Bkrtcy.W.D.Mo. 1992) ("simple non-payment of a bill" doesn't amount to defalcation); *Stanley H. Silverblatt Electrical Contractor, Inc. v. Marino (In re Marino)*, 139 B.R. 380, 385 (Bkrtcy.D.Md.1992) ("defalcation" requires "evidence of wrongdoing beyond failure to pay"); *with Peerless Insurance Co. v. Misiaszek (In re Misiaszek)*, 162 B.R. 80, 82 (Bkrtcy.D.N.H.1993) (majority of courts "have

## SUMMARY JUDGMENT

To prevail on a motion for summary judgment, the movant must satisfy the criteria set forth in Fed.R.Civ.P. 56 as made applicable by Fed.R.Bkrtcy.P. 7056. Fed.R.Civ.P. 56(c) provides in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

■ Although Debtor has not filed a cross motion, we may grant summary judgment against Plaintiffs *sua sponte,* because their own motion put the elements of their case into play, and the basis of our decision is purely legal. *U.S. Lines, Inc. v. American Steamship Owners Mutual Protection and Indemnity Association, Inc. (In re U.S. Lines, Inc.),* 169 B.R. 804, 820–21. *See also, Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) ("district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence.") (citations omitted); *LTV Corp. v. AM General Corp. (In re Chateaugay),* 154 B.R. 843, 852 (Bkrtcy.S.D.N.Y. 1993) ("Where there are no disputed issues of material fact and the nonmoving party is entitled to judgment as a matter of law, a court may *sua sponte* enter judgment against a party moving for summary judgment.") (citations omitted); 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice 56.12 (2d ed. 1994).

refused to require some misconduct or bad faith or fraud activity as an element of 'defalcation' "); *Advance–United Expressways, Inc. v. Wines (In re Wines),* 112 B.R. 44, 45 (Bkrtcy.S.D.Fla.1990) ("Defalcation is defined as the slightest misconduct, negligence or ignorance and it does not require intentional conduct."); *Codias v. Codias (In re Codias),* 78 B.R. 344, 346 (Bkrtcy.S.D.Fla. 1987) ("negligence or ignorance may be 'defalcation' "). We briefly note the matter in the hope that it may be useful to our judicial siblings who face the issue in the future. The present language of § 523(a)(4) is a compromise between House and Senate proposals with different

## "FIDUCIARY CAPACITY" UNDER § 523(A)(4)

■ The sole basis Plaintiffs allege for nondischargeability is Debtor's "defalcation while acting in a fiduciary capacity." § 523(a)(4). "Ascertaining the existence of a fiduciary relationship is the threshold issue in determining whether defalcation in contravention of § 523(a)(4) occurred." *First Valley Bank v. Ramonat (In re Ramonat),* 82 B.R. 714, 718 (Bkrtcy.E.D.Pa.1988). Plaintiffs have the burden of proof on the issue. *Id.*

One of the primary purposes of the bankruptcy law is to relieve honest debtors of the burden of their indebtedness and to provide them with a fresh start so that they can become productive members of society. The court must therefore strictly construe the exceptions to discharge.... Accordingly, the creditor bears the burden of establishing that the debt sought to be declared nondischargeable falls within the statutory exception.

*In re Shipe,* 41 B.R. 584, 587 (Bkrtcy.D.Md. 1984) (citations omitted). *See also, Ramonat, supra,* 82 B.R. at 718 ("Exceptions to discharge are construed against creditors and in favor of debtors.").

■ Courts generally agree that "the existence of an express trust, not merely an implied or constructive trust, is a prerequisite to a finding of § 523 defalcation." *Id.,* at 719. *See also, Stanley H. Silverblatt Electrical Contractor, Inc. v. Marino (In re Marino),* 115 B.R. 863, 868 (Bkrtcy.D.Md.1990) ("For a trust to satisfy the fiduciary capacity requirement of 11 USC § 523(a)(4), the trust on which it is based must be a technical trust in existence at the time of the defalcation.");

phrasings. *See,* 124 Cong.Rec. H11096 (daily ed. Sept. 28, 1978) and S17412 (daily ed. Oct. 6, 1978) (remarks of Rep. Edwards and Sen. DeConcini). The Senate version excepted "fraud while acting in a fiduciary capacity, defalcation, embezzlement or misappropriation." This phrasing moves "defalcation" outside the confines of a fiduciary relationship, and into the realm of general obligation. This suggests that the Senate at least believed that some degree of misconduct beyond mere non-payment is necessary for defalcation. Otherwise, mere failure to pay any debt would be grounds for nondischargeability, and discharge would be the exception rather than the rule.

*Shipe, supra,* 41 B.R. at 587 ("technical trust relationship rather than one implied from contract" is required). This requirement, as Chief Judge Mannes noted in *Shipe,* 41 B.R. at 587, flows from the Supreme Court's construction of section 17(a)(4) of the Bankruptcy Act in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934) ("It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto.").

 The elements necessary to establish the existence of an express trust are (1) words expressing the intent to create a trust; (2) a trust res; and, (3) a definite subject or purpose relating to the res. *Id.* The language of a statute may, despite Debtor's protestations to the contrary, create a technical express trust, but only if the statute sets forth specific fiduciary duties and creates a trust res. *Id. See also, Martin, supra,* 161 B.R. at 676 (9th Cir. BAP 1993) ("The statute must define the trust res, spell out the trustee's fiduciary duties and impose a trust prior to and without reference to the wrong which created the debt.") (*quoting In re Baird,* 114 B.R. 198, 202 (9th Cir. BAP 1990)).

For the reasons that follow, we conclude that a PACA trust is an anatomical anomaly, lacking key features conventionally assumed necessary to constitute either an express or constructive trust. *See, e.g., Merrill Farms Corp. v. H.R. Hindle & Co., Inc. (In re H.R. Hindle & Co., Inc.),* 149 B.R. 775, 784 (Bkrtcy.E.D.Pa.1993) ("extraordinary aspect" of PACA trust is that beneficiaries do not have to trace trust assets). More particularly, we hold, (1) PACA does not and Congress did not intend to impose fiduciary obligations on produce buyers; (2) PACA invites commingling of trust and non-trust assets, the practical consequence of which in the usual case is that no readily identifiable trust res can be said to exist; and (3) PACA's purpose—ensuring payment to PACA sellers—is not achieved by subjecting the PACA debtor to fiduciary obligations constraining its use of identifiable trust assets, but by imposing what is in reality a super lien on the commin-

gled assets of the PACA debtor. Indeed, "It is clear from the terms of the PACA amendments and from the supporting legislative history that Congress intended to create a priority status for unpaid produce claimants, priming even the administrative claims which normally stand first in line in a bankruptcy distribution." *In re Fresh Approach, Inc.,* 51 B.R. 412, 420 (Bkrtcy.N.D.Tex.1985). *See also, Hindle, supra,* 149 B.R. at 785 ("Legislative history supports Congress' intention to give [trust beneficiaries] almost unconditional priority.... [PACA trust creates] a claim status that trumps all other creditors, even secured creditors."); *Continental Fruit Co. v. Thomas J. Gatziolis & Co., Inc.,* 774 F.Supp. 449, 453–54 (N.D.Ill.1991) ("The interest of PACA trust beneficiaries trumps that of nearly every other creditor, including secured lenders....").

## PACA'S TRUST PROVISIONS

 PACA's trust provisions afford sellers of perishable agricultural products "greatly enhanced protection ... unavailable to other creditors." *Anic, Inc. v. Chipwich, Inc. (In re Chipwich, Inc.),* 165 B.R. 135, 138 (Bkrtcy.S.D.N.Y.1994). In particular, 7 U.S.C. § 499e(c)(2) provides in pertinent part:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

Enforcing a PACA trust in bankruptcy diminishes the bankruptcy estate and reduces payments to unsecured creditors in at least two ways. *Chipwich, supra,* 165 B.R. at 138.

First, trust assets [5] are excluded from the bankruptcy estate. *Id.; Pereira v. Marine Midland Bank, N.A. (In re Al Nagelberg & Co., Inc.),* 84 B.R. 19, 21 (Bkrtcy.S.D.N.Y. 1988); H.R.Rep. No. 595, 95th Cong., 1st Sess. 368 (1977), U.S.Code Cong. & Admin.News 1978, 5787, 6323–6324, *reprinted in* Norton Bankruptcy Code Pamphlet 1993–94 Edition, 492. Second, secured creditors can be forced to disgorge payments made by the debtor with trust assets, *id.,* at 21–22; *Chipwich, supra,* 165 B.R. at 138, thereby increasing their secured claims against the estate or transforming a secured claim into an unsecured claim.

The legislative and regulatory histories of PACA's trust provisions evidence a clear intent to prefer the sellers of perishable commodities to other creditors. The wisdom behind such "special interest" legislation "can be questioned," *Hindle, supra,* 149 B.R. at 785, but the fact remains that the preference is law. The rationales for giving special protection to favored creditors appear, at least from behind the bench of a seat on the nation's principal commercial court, to be at odds with business reality. The PACA trust provisions are grounded in a rather remarkable Congressional determination that garden-variety secured transactions commonplace in almost every area of the marketplace constitute a burden on interstate commerce, and are contrary to the public interest: [6]

It is hereby found that a burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest. This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

7 U.S.C. § 499e(c)(1). Comments by the Department of Agriculture on its rules implementing the PACA trust provisions strain credulity:

The purpose of the Perishable Agricultural Commodities Act ... is to suppress unfair and fraudulent practices in the marketing of fruits and vegetables in interstate and foreign commerce.... In the past few years, three problem areas have become apparent. They reflect changes in the industry's financial picture, and have added an abnormal marketing risk burden against which sellers are unable to protect themselves. Climbing overhead costs, including the cost of debt servicing, are reflected by a marked increase in delayed payments for produce. Also, an increase in hidden security agreements which encumber buyers' assets results in the diver-

---

**5.** Our discussion of PACA's impact on distributions in bankruptcy uses the phrase "trust assets" somewhat loosely. In fact, as we note below, PACA beneficiaries are entitled to receive not only trust assets, but all commingled assets which a debtor can't prove aren't trust assets.

**6.** Congress justified the PACA trust provisions as necessary to protect the small businesses that actually grow the produce thousands of miles from the stores where it is sold.

The process of growing, harvesting, packing and shipping perishables is a real gamble; costs are high, capital is tied up in farm land and machinery, and returns are delayed until the crop is sold. If the grower-shipper cannot realize any returns on the sale of the crop when due, he may not be able to survive. Thus, where business failures or reorganiza-

tions occur on the part of buyers of their crop, the growers are usually the parties least able to withstand the losses and inevitable delays which result from such actions.

H.R.Rep. No. 543, 98th Cong., 1st Sess. 3 (1984), U.S.Code Cong. & Admin.News 1984, 405, 406. The statute, however, is not narrowly tailored to protect only the growers for whom Congress' professes concern. Rather, it protects "unpaid suppliers, sellers, or agents," 7 U.S.C. § 499e(c)(2), thus sweeping in not only the growers, but all the middlemen between the grower and the supermarket. H.R.Rep. No. 98–543, *supra,* at 5, U.S.Code Cong. & Admin.News 1984 at 408–409; *In re W.L. Bradley Co., Inc.,* 75 B.R. 505, 510 (Bkrtcy.E.D.Pa.1987). Plaintiffs, for example, are not growers, but "corporations engaged in the business of buying and selling wholesale quantities of perishable agricultural commodities." Plaintiffs' Complaint, § 2.

sion of money owed for produce away from suppliers. Finally, business failures and bankruptcy losses with no possibility of meaningful recovery have shown a steady increase. These factors combine to prejudice sellers' ability to obtain prompt payment for product. It is these problem areas that the [PACA trust] provisions are intended to overcome.

49 FR 45735, 45737 (11/20/84). This seems to us to be a case of the cast-iron kettle calling the silver teapot black. Security agreements are governed by Article 9 of the Uniform Commercial Code, which, with exceptions not relevant here, requires public notice in a place of record to perfect the secured creditor's interest in the collateral. U.C.C. § 9–302(1) (1977). The purpose of the notice provision is precisely "to provide protection for creditors who may need to know whether certain property is encumbered." *In re Universal Trend, Inc.*, 114 B.R. 936, 941 (Bkrtcy.N.D.Ohio 1990), *quoting United Brotherhood of Carpenters and Joiners of America v. Paul Lugger Displays, Inc.*, 2 Ohio App.3d 190, 193, 441 N.E.2d 581, 584 (Ohio Ct.App.1981). Under the U.C.C., "hidden" security agreements rarely cause problems for other creditors, because they don't count for much, especially in bankruptcy. U.C.C. § 9–301(1), (3) (1977). Accordingly, we fail to see how a secured transaction governed by the Uniform Commercial Code as enacted by state legislatures can be an "unfair or fraudulent" practice.

A PACA trust, by contrast, is a unique breed of property interest that is both hidden and ravenous, capable of divesting other creditors of properly perfected security interests.[7] In *Universal*, discussed below, the Court refused to enforce a state statutory trust with a similar predatory impact, in part precisely because it "clearly undermines the strong policy of Article 9 of the U.C.C. which sought to abolish silent liens." *Universal, supra*, 114 B.R. at 942. While PACA may prevent "business failures and bankruptcy losses with no possibility of meaningful recovery" for the privileged class of creditors who fall within its purview, it does so by shifting the loss to all the other creditors, secured and unsecured alike. *See, Hindle, supra*, 149 B.R. at 785. Indeed, PACA's practical effect is to give produce sellers first crack at a debtor's assets, without regard to whether those assets are subject to a prior lien or were derived from sources other than the sale of produce. We turn now to an examination of the way PACA is structured to accomplish this divestiture.

The PACA trust is unusual in the sense that it is a single trust impressed for the benefit of all of a debtor's unpaid suppliers on all the commodities received by the debtor in each and every one of its transactions in produce, and all proceeds, products, and receivables derived from any and all of those transactions. 7 U.S.C. § 499e(c)(2). The Department of Agriculture's explanation of

7. Three courts have upheld the constitutionality of one aspect of PACA, impressing a trust for the benefit of sellers in the goods they sold ahead of the floating liens of secured lenders in after-acquired property. *C & E Enterprises, Inc. v. Milton Poulos, Inc. (In re Milton Poulos, Inc.)*, 94 B.R. 648, 650–51 (Bkrtcy.C.D.Cal.1988), relied on two cases upholding the constitutionality of 7 U.S.C. § 196 of the Packers and Stockyards Act, which served as the model for the PACA trust. *In re Frosty Morn Meats, Inc.*, 7 B.R. 988, 1002–04 (M.D.Tenn.1980); *Fillippo v. S. Bonaccurso & Sons, Inc.*, 466 F.Supp. 1008, 1012 n. 2 (E.D.Pa. 1978). All three cases deal with the constitutionality of relegating the secured creditor to second place at the outset, when PACA interposes the trust beneficiaries' interests in specific and identifiable collateral ahead of the secured lender's lien. The constitutional arguments of the three above-cited cases, however, do not address the issue of whether, in the end game, PACA deprives secured lenders of equal protection or unconstitutionally takes property from them without due process. In the end game, described in greater detail hereafter, PACA beneficiaries collect off the top of a commingled mass of trust and non-trust assets because the debtor can't meet its burden of proving which assets aren't trust assets. The property interests of secured creditors are taken, with no process, it seems to us, when PACA beneficiaries are allowed to collect off the top, without pro-ration with secured creditors, from an asset base that includes non-trust assets securing those creditors. *See Dewsnup v. Timm*, 502 U.S. 410, ——, · 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992) (noting Court's "concern" about statutory provisions that "take from the mortgagee rights in the specific property held as security," as expressed in *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 594, 55 S.Ct. 854, 865, 79 L.Ed. 1593 (1935)). The constitutionality of PACA is not before us, and must, thus, be for another day.

the implementing regulations, 7 C.F.R. § 46.-46, notes that

> the trust is to be a nonsegregated "floating" trust, and that commingling of trust assets is permitted. There is no necessity to specifically identify all of the trust assets through the entire accrual and disposal process other than as required under current regulations.[8] When claiming under the trust it is the responsibility of the claimant against the trust to establish, through business records, the details of the transaction for which payment is sought.
>
> Trust assets are available for other uses by the buyer or receiver. For example, trust assets may be used to pay other creditors. It is the buyer's or receiver's responsibility as trustee to insure that it has sufficient assets to assure prompt payment for produce and that any beneficiary under the trust will receive full payment, including sufficient assets to cover the value of disputed shipments.
>
> While the regulations do not prohibit a buyer or receiver from granting a secured interest in trust assets, they make it clear that the secured interest is secondary and specifically voidable in order to satisfy debts to unpaid suppliers, sellers, or agents in perishable agricultural commodity transactions. Similarly, claims of non-secured creditors are subordinate to the priority trust claims of supplier-creditors.
>
> If a buyer or receiver declares bankruptcy ... trust assets are not to be considered part of the estate to be distributed to other creditors or sold unless all trust beneficiaries have been paid.

49 FR at 45738.

As the above-quoted regulations indicate, the debtor is invited to commingle trust and non-trust assets, and to use both for any purpose so long as the merchant preserves sufficient assets to pay produce suppliers. "However, once any trust assets are commingled, the *buyer* has the burden of establishing which assets are not subject to the trust."

*Tony Vitrano Co. v. National Produce Co., Inc.*, 815 F.Supp. 23, 25 (D.D.C.1993) (emphasis added). *See also, Sanzone–Palmisano Co. v. M. Seaman Enterprises, Inc.*, 986 F.2d 1010, 1014 (6th Cir.1993) (reh. and reh. en banc den. April 16, 1993); *Six L's Packing Co. v. West Des Moines State Bank*, 967 F.2d 256, 258 (8th Cir.1992). The seller has no obligation to trace. *Kurtzman v. CIT Business Credit Corp. (In re N. Merberg & Sons, Inc.)*, 166 B.R. 567, 570 (Bkrtcy.S.D.N.Y. 1994); *Hindle, supra,* 149 B.R. at 784; *Gullo Produce Co., Inc. v. A.C. Jordan Produce Co., Inc.*, 751 F.Supp. 64, 68 (W.D.Pa.1990). Thus, if the PACA debtor miscalculates, experiences an unforeseen setback, or otherwise comes up short, it is "other unsecured creditors—and even secured creditors—... [who] must suffer the 'harsh effect' of the produce suppliers being elevated from the status of unsecured creditors to trust beneficiaries." *Sanzone, supra,* 986 F.2d at 1014.

> [A] purchaser, or PACA debtor, has the burden of showing that disputed assets were not acquired with proceeds from the sale of produce or produce-related assets.... [I]n most cases it will be virtually impossible for a PACA debtor to trace the origin of the disputed assets.... [I]n the conventional case, where the produce was sold at a gross profit, the proceeds were commingled in a general fund, and the general fund was used to buy more inventory, the PACA debtor will be unable to meet its burden, and the produce supplier will prevail.

*Id. See also Fresh Approach, supra,* 51 B.R. at 422 (Debtor has burden of tracing, which, as a practical matter, is impossible). The PACA trust sucks up not only inventory, but whatever other assets are purchased with commingled funds. In the *Tony Vitrano Co.* case, for example, the Court held that two pieces of real property owned by the PACA debtor were trust assets because the debtor couldn't prove that no trust money was used to pay for the properties. *Tony Vitrano Co., supra,* 815 F.Supp. at 25. We do not believe

---

**8.** Regulations specifically governing the trust do not require any accounting for trust assets. 7 C.F.R. § 46.46. Indeed, they note, "Commingling of trust assets is contemplated." 7 C.F.R. § 46.46(c). This complete lack of any record-keeping requirement is in striking contrast to the exhaustive mandates for keeping records related to the handling of the produce. *See, e.g.,* 7 C.F.R. §§ 46.2(y), (z), 46.14(a), 46.15–16, 46.18–22, 46.24.

that in these circumstances there can be said to be an identifiable trust res. The commercial reality is that PACA invites commingling and a blurring of the boundaries between the res and other assets, and then authorizes trust beneficiaries, under cover of the resulting cloud of ambiguity, to feed on non-trust assets. While the UCC also permits commingling, U.C.C. § 9–205, secured creditors "share ratably" in the commingled mass. U.C.C. § 9–315 comment 4. Indeed, were fairness and respect for the property rights of others the object, the law would allow PACA beneficiaries only "the ratio that the cost of the goods to which each interest originally attached bears to the cost of the total ... mass." U.C.C. § 9–315(2). Instead, PACA beneficiaries take what's owed them off the top of a commingled asset base, without regard to the property interests of other creditors.

## PLAINTIFFS' FAILURE TO PROVE PERFECTION

Although the PACA trust is breathtaking in its sweep, beneficiaries are still required to comply with certain procedural requisites to perfect their interests in the trust. The statute provides, in pertinent part:

> The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker and has filed such notice with the Secretary within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, [and] (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction....

7 U.S.C. § 499e(c)(3). The regulations prescribe, in most cases, that buyers must pay within 10 days after receipt of the produce.

*Wilson Mushroom Co. v. Davis Distributors, Inc. (In re Davis Distributors, Inc.),* 861 F.2d 416, 417 (4th Cir.1988); 7 C.F.R. § 46.-2(aa). Although the parties may expressly agree to a longer repayment period, "the maximum time for payment for a shipment to which a seller, supplier, or agent can agree and still qualify for coverage under the trust is 30 days after receipt and acceptance of the commodities...." 7 C.F.R. § 46.46(f)(2); *Davis, supra,* 861 F.2d at 417.

As we noted in *Chipwich,* Courts called upon to enforce PACA trusts in the bankruptcy context have been in conflict over whether to require strict compliance with PACA's procedural requisites or whether substantial compliance is adequate. *See* cases collected at *Chipwich, supra,* 165 B.R. at 138; *see also* Ali F. Morad, Comment: Bankruptcy and the Perishable Agricultural Commodities Act Trust, 7 Bankr.Dev.J. 291, 294–99 (1990). The Court in *In re W.L. Bradley Co., Inc.,* 75 B.R. 505 (Bankr. E.D.Pa.1987) for example, liberally construed the requirement of 7 U.S.C. § 499e(c)(3) that notice be filed "within thirty calendar days after" payment is due because it "fail[ed] to see what policy goal is served by invalidating a trust notice filed before the buyer's payment is actually due." *Bradley, supra,* 75 B.R. at 511–12. The Court then discussed two bankruptcy policy goals which would have been served by strict construction, "the fundamental principle of equality of distribution," *id.,* at 513, and the reorganization of debtors.[9] *Id.*

■ The Court was clearly correct in holding that "the principle of equality of distribution was created by Congress and it is within Congress' province to create exceptions to the principle," and that "Congress has done so" for the benefit of PACA sellers. *Id.,* at 513. The PACA exception, however, was expressly limited by Congress, which provided that, "The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person" complies with statutory requi-

---

9. Judge Scholl, in *Hindle,* held that strict construction was warranted because, "Every special interest protection not only undermines the rights of general unsecured creditors, but also the concept of a unitary, self-contained Bankruptcy Code." *Hindle, supra,* 149 B.R. at 785.

Judge Scholl also noted that he was "extremely reluctant to provide additional protections to producers beyond those extraordinary and perhaps excessive ones which Congress has already provided." *Id.,* at 788.

sites. 7 U.S.C. § 499e(c)(3). We believe that the most appropriate way to reconcile the competing Congressional policies is to strictly observe the boundaries of the PACA exception that Congress carved out. Accordingly, we ruled in *Chipwich* that:

> Given PACA's adverse impact on the estate and its incompatibility with the fundamental bankruptcy principle of equality of treatment for similarly situated creditors, . . . a PACA claimant cannot benefit from PACA, at the expense of other creditors, without having strictly complied with the statute and applicable regulations.

*Id.* This rule of strict compliance is consistent with the Fourth Circuit's holding in the *Davis* case. Although not announcing a general requirement of strict compliance, the Fourth Circuit strictly construed the maximum time for payment provisions of the regulations and denied trust benefits to the produce seller. *Davis, supra,* 861 F.2d at 419–20; *Morad, supra,* 7 Bankr.Dev.J. at 294, n. 33.

■ Plaintiffs' Complaint fails to allege compliance with any procedural requirements. Affidavits by Plaintiffs in support of their summary judgment motion do state that Debtor was timely and properly served with the required notice. Debtor's Affidavit opposing summary judgment, however, avers that Ex–Sell did not in fact receive timely and proper notice, and that the repayment period for each Plaintiff was more than the statutory maximum of 30 days. If true, this would bar Plaintiffs' recovery. *Davis, supra,* 861 F.2d at 419–20. The conflicting affidavits "create a factual issue unresolvable in a motion for summary judgment under Rule 56." *C.H. Robinson Co. v. B.H. Produce Co., Inc.,* 723 F.Supp. 785, 796 (N.D.Ga.1989), *aff'd,* 952 F.2d 1311 (11th Cir.1992). Accordingly, Plaintiffs' motion must be denied.

## PACA DEBTOR NOT A FIDUCIARY

■ In addition, Plaintiffs' complaint must be dismissed, because a PACA debtor does not serve in a fiduciary capacity for the benefit of produce suppliers, within the meaning of § 523(a)(4), and thus cannot be guilty of "defalcation while acting in a fiduciary capacity."

Each of the only three cases we found that ruled directly on the issue before us holds that a PACA debtor does in fact serve in a fiduciary capacity. *Nuchief Sales, Inc. v. Harper,* 150 B.R. 416, 418–19 (Bkrtcy. E.D.Tenn.1993); *Collins Bros. Corp. v. Nix (In re Nix),* 1992 WL 119143, 3 (M.D.Ga. 1992); *Tom Lange Company, Inc. v. Stout (In re Stout),* 123 B.R. 412, 415 (Bkrtcy. W.D.Okla.1990). Underlying the rationale of each of the three cases, however, is the same broken-legged syllogism.

*Nuchief* holds without explanation that a PACA trust satisfies the requirements of § 523(a)(4), citing *Nix* and *Stout. Nuchief, supra,* 150 B.R. at 418–19. *Nix, supra,* 1992 WL 119143 at 3, which relies on *Stout,* and *Stout, supra,* 123 B.R. at 415, both hold:

> —Courts have ruled that statutory trusts under the Packers and Stockyards Act, 7 USC § 181–229 (PSA), create fiduciary obligations which are nondischargeable under § 523(a)(4).

> —The PACA trust provisions are modeled after the PSA trust.

> —Therefore, the PACA trust creates fiduciary obligations which are nondischargeable under § 523(a)(4).

In support of the first leg of their syllogism, *Nix* and *Stout* both cite the same two PSA opinions, *National Bonding & Accident Insurance Co. v. Petersen (In re Petersen),* 51 B.R. 486, 488 (Bkrtcy.D.Kan.1985); and *Baugh v. Matheson (In re Matheson),* 10 B.R. 652, 656 (Bkrtcy.S.D.Ala.1981). Neither PSA opinion, however, has anything to do with the specific PSA statute after which the PACA trust was modeled. The PACA trust, 7 U.S.C. § 499e(c), is based on 7 U.S.C. § 196, *Hindle, supra,* 149 B.R. at 784, which impresses a trust upon "[a]ll livestock *purchased* by a *packer* in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock proceeds derived therefrom." Emphasis added. At issue in *Petersen* and *Matheson* were entirely different trust provisions governing *"[e]very market agency and licensee* engaged in *selling* livestock or live poultry on a commission or agency basis. . . ." *Petersen, supra,* 51 B.R. at 488 n. 4, and *Mathe-*

son, supra, 10 B.R. at 655, *quoting* 9 C.F.R. § 201.42 (emphasis added). Moreover, the trust provisions at issue in the two PSA cases were established by regulation, 9 C.F.R. § 201.42, promulgated under 7 U.S.C. § 228. We could find no opinion holding that a PSA debtor serves in a fiduciary capacity under 7 U.S.C. § 196 for purposes of § 523(a)(4).

Closely comparing the PACA trust at issue here with the conventional PSA trust at issue in *Petersen* and *Matheson* reveals dramatic differences, and serves as a useful device for elucidating our reasons for concluding that a PACA trust is not a trust in the conventional sense, and does not impose fiduciary obligations on produce buyers. Among the features which distinguish a PACA trust from a PSA trust are the following:

— A PACA trust is comprised of all the produce purchased by the PACA debtor, plus all products, proceeds and receivables derived therefrom. 7 C.F.R. § 46.46(c). Moreover, as noted above, the trust presumptively includes everything that isn't nailed down. A PSA trust consists of payments actually received from livestock buyers and the difference between what is received and what is due from the buyer, which the PSA debtor is required to deposit into the custodial account pending receipt of full payment from the buyer. 9 C.F.R. § 201.42(a), (c). Thus, the PSA trustee is obliged to pay up front the difference between what he owes the seller and what the buyer pays. By contrast, PACA beneficiaries are entitled after the fact of nonpayment to the mass of encumbered and unencumbered assets produced by commingling.

— A PACA trust, a single, nonsegregated trust for the benefit of all eligible produce suppliers, is described as "floating," because, like a lien on after-acquired property, it encompasses whatever subject property comes into the debtor's hands. In addition, commingling of trust and non-trust assets is permitted. 7 C.F.R. § 46.46(c), (d). PSA trust funds must be maintained in a segregated custodial account, 9 C.F.R. § 201.42(a), (b), which "are designed to safeguard proceeds of live-

stock against losses suffered in instances of insolvency." *Petersen, supra,* 51 B.R. at 488.

— PACA trust assets can be used for other purposes, including payment of other creditors. 49 FR 45735, 45738. PSA trust funds can be used only to pay sellers and for transaction charges. 9 C.F.R. § 201.42(d).

— A PACA debtor has no obligation to track PACA trust funds in and out, H.R.Rep. 95–543, *supra,* at 5 U.S.Code Cong. & Admin.News 1984 at 409; 49 FR 45735, 45738; 7 C.F.R. § 46.2(y), (z), but is required only to maintain sufficient trust assets to pay its produce suppliers. 7 C.F.R. § 46.46(e). A PSA debtor must account for its handling of all trust funds, and each transaction must be accounted for separately. 9 C.F.R. § 201.42(a), (c), (e).

— The PSA regulations state specifically that a PSA debtor acts in a fiduciary capacity. 9 C.F.R. § 201.42(b), (g). The PACA regulations do not. Moreover, the features noted above effectively relieve the PACA debtor of any obligation to produce suppliers except to pay. Finally, the legislative history states Congress' intention that the PACA trust provisions will not "change the methods of doing business by either the seller or the buyer." H.R.Rep. No. 543, 98th Cong., 1st Sess. 4 (1983) U.S.Code Cong. & Admin.News 1984, 407.

To summarize, the PSA trust created by 9 C.F.R. § 201.42 required that trust funds be placed in a special custodial accounts, stated that the commission seller served in a fiduciary capacity, and forbad use of the funds for any purpose except to pay sellers and sales expenses. In that PSA context, "the mere act of using the trust fund for any purpose other than the purpose for which the trust was created ... constitutes misuse or misappropriation of the trust fund which is a defalcation committed by the fiduciary." *Nix, supra,* 1992 WL 119143 at 3, *quoting Matheson, supra,* 10 B.R. at 656. In the PACA context, however, use of the trust

funds for other purposes was specifically authorized. 49 FR 45735, 45738. Accordingly, it is difficult to see how the PACA debtor can be said to hold trust funds in a fiduciary capacity, or how using them for other purposes constitutes defalcation. Indeed, given the blurring of traditional trust lines on so many fronts, we conclude that what Congress created is not a trust in the customary sense, but a hybrid security arrangement for the benefit of produce sellers.

Although 7 U.S.C. § 499e(c) uses the word "trust", it otherwise evidences no intent to change the underlying debtor-creditor relationship by creating fiduciary obligations. We believe, rather, that the clear Congressional intent was to enable produce sellers to cut in front of the bankruptcy distribution line set out in § 507, and take first crack at a PACA debtor's assets. By denominating the PACA debtor's assets as a trust held for the benefit of sellers, Congress excluded them from property of the estate under § 541. *Universal, supra,* 114 B.R. at 939; *In re Monterey House, Inc.,* 71 B.R. 244, 248 (Bkrtcy.S.D.Tex.1986); *Fresh Approach, supra,* 51 B.R. at 419–20; 124 Cong.Rec. H11096 (daily ed. Sept. 28, 1978); S17413 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards and Sen. DeConcini), *quoted in* Norton Bankruptcy Code Pamphlet 1993–94 Edition, 493.[10] Although, as we noted at the outset, § 523(a)(4) is applicable only to express or technical trusts, property held in trusts that are constructive or statutory, but that do not meet the requirements of an express trust, may also be excluded from property of the estate under § 541. *See, U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n. 10, 103 S.Ct. 2309, 2313–14 n. 10, 76 L.Ed.2d 515 (1983) (statutory trust for employee withholding taxes under 26 U.S.C. § 7501); *Selby v. Ford Motor Co.,* 590 F.2d 642, 649 (6th Cir.1979) (statutory trust for benefit of subcontractors and materialmen); 4 Collier on Bankruptcy § 541.13, 541–77–78 (15th ed. 1994) (constructive trusts excludable from estate); *Universal, supra,* 114 B.R. at 939.

The PACA trust is sometimes denominated a "constructive trust." *Dimare Homestead, Inc. v. Fair (In re Fair),* 134 B.R. 672, 675 (Bkrtcy.M.D.Fla.1991). Ordinarily, however, even the beneficiary of a constructive trust

> must identify the trust fund or property in the estate, and if such fund or property has been mingled with the general property of the debtor, sufficiently trace the trust property. If the trust fund or property cannot be identified in its original or substituted form, the [beneficiary] becomes merely a general creditor of the estate. The same result will accrue where the trust property has been disposed of or dissipated in such manner as to leave nothing in its place.[11]

---

**10.** The statements of Rep. Edwards and Sen. DeConcini "were the formal explanations" of changes to bankruptcy legislation negotiated directly by Congressional leaders, without a conference committee. "Thus," concludes Judge Norton, "these Statements, as a consensus of these committee leaders, carry a weight in the legislative history equal to a conference report." Norton Bankruptcy Code Pamphlet 1993–94 Edition, xxiii–xxiv n. 1. We do not necessarily agree with this conclusion.

**11.** *First State Bank of Miami v. Gotham Provision Co., Inc. (In re Gotham Provision Co., Inc.),* 1 B.R. 255, 261 (Bkrtcy.S.D.Fla.1979), concluded that livestock sellers under a PSA trust were relieved of the obligation to trace by the common law of trusts.

> Under general principles of trust law, a person with actual or constructive knowledge of a trust takes funds from the trustee subject to the beneficiaries's claims. Scott, The Law of Trusts § 288 (3d ed. 1967). Here, the Bank had at least constructive knowledge of the

trust, because the trust is created by federal statute. . . .

> Further principles of trust law provide that the commingling of trust funds with funds not subject to the trust results in a lien for the benefit of the beneficiaries on the commingled fund. Scott, The Law of Trusts §§ 291.4 and 519.1. . . .

The Bankruptcy Court's view of the general principles of trust law were affirmed and reiterated on appeal, 669 F.2d 1000, 1011 (5th Cir.1982), although the opinion was also reversed in part on other grounds and remanded. The Bankruptcy Court simply misstated Scott. Section 288 stands for the proposition that when "a trustee transfers trust property in breach of trust, and the transferee when he receives the transfer has notice of the breach of trust, the interests of the beneficiaries are not cut off." *Id.,* at § 288. What is critical under § 288 is not notice of the existence of the trust, but notice that one has received property in breach of that trust. *See, id.,* § 286. When trust property is transferred to

4 Collier on Bankruptcy § 541.13, 541–79 (15th ed. 1994). *See also, Whiting Pools, supra,* 462 U.S. at 205 n. 10, 103 S.Ct. at 2314 n. 10 (IRS required to trace statutory trust funds for employee withholding taxes); *First Federal of Michigan v. Barrow,* 878 F.2d 912, 915 (6th Cir.1989) ("It is beyond a peradventure that, as a general rule, any party seeking to impress a trust upon funds for purposes of exemption from a bankrupt estate must identify the trust fund in its original or substituted form."); *Universal, supra,* 114 B.R. at 939. The PACA trust, however, turns conventional principles inside out. It consumes all commingled assets except those which the Debtor can prove aren't trust assets. The PACA trust beneficiary, as noted above, has no obligation to identify or trace trust assets. *Fresh Approach, supra,* 51 B.R. at 422. In the usual case, it simply collects off the top. This inversion of trust principles evidences, we believe, an attempt to do something other than create a conventional trust.

The *Universal* court wrestled with the issue of whether a state statute purporting to create a trust actually did. An Ohio statute, O.R.C. § 4113.15(C), provided:

> In the absence of a contest, court order or dispute, an employer who is a party to an agreement to pay or provide fringe benefits to an employee or to make any employee authorized deduction becomes a trustee of any funds required by such agreement to be paid to any person, organization, or governmental agency from the time that the duty to make such payment arises.

Although the Ohio statute and the PACA trust provision differ in phrasing, the practical effects are quite similar in several respects. Both would impose a trust

> despite the fact that (a) no actual express trust document exists, (b) no person is designated as a trustee, except in the statute, and (c) there is neither a designation of the specific trust property nor a separate trust bank account.[12] Indeed the "trust property" would most likely be commingled in the "trustee's" general account.

*Universal, supra,* 114 B.R. at 942. Based on those features, the Court held that

> it is doubtful whether, under generally accepted principles of trust law, O.R.C. § 4113.15(C) actually creates something which could be called a trust and that this statute clearly undermines the strong policy of Article 9 of the U.C.C. which sought to abolish silent liens. The Bankruptcy Code often takes account of property rights which are determined by state law, as for example, the perfection of security interests and exempt property of the Debtor. Nonetheless, the state law must attend to the realities and technicalities of the property rights created, or else those rights will be dismissed as disguised priorities under the Bankruptcy Code. Simply calling certain funds a "trust" no more creates a trust than calling a loan "perfected" creates a mortgage.

*Id.,* at 942–43. "Giving effect to a 'trust' when one has not been literally created," the Court held, "awards to a state legislature favored creditor a super-bankruptcy priority

a third party and the transfer is not in breach of the trust, the purchaser, contrary to the holding in *Gotham* quoted above, holds the property free of trust. *Id.,* at 283. Moreover, even if the transfer is in breach of trust, a transferee that is a bona fide purchaser still holds free of the trust. *Id.* Thus constructive notice of the existence of a trust is irrelevant. Moreover, a PACA trustee is expressly authorized to commingle funds and to use the commingled assets for other purposes. Thus, it is difficult to see how lenders can be said to be on notice of anything. *Gotham*'s references to §§ 291.4 and 519.1 are similarly off the mark. Section 291.4 deals with a transferee with notice that the transfer was in breach of the trust. §§ 291.3–.4. Section 519.1 covers a fiduciary who mingles funds of several claimants with his own funds, and does not cover the situation where trust funds are mingled with funds in

which other creditors have an interest. In fact, Scott argues strongly for a rule of tracing that gives the claimant "priority only if and to the extent that he is able to trace his property into a product in the hands of the wrongdoer at the time when he seeks to enforce his claim." *Id.,* at § 521(4). "Unless a particular claimant can show that the wrongdoer still has his property, in one form or another, he should share ratably with the other creditors." *Id.*

12. Although, PACA does designate an initial trust res, its invitation to commingle assets, as we note above, blurs the lines between trust and other assets and then gives trust beneficiaries the benefit of the ambiguity. In the usual case, then, there is no readily identifiable trust res.

which contravenes those priorities established by the Bankruptcy Code." *Id.,* at 943. That result violates the U.S. Constitution, which makes bankruptcy the exclusive province of Congress and makes federal law take priority over state law. *Id.;* U.S. Const. art. I, § 8, cl. 4; art. VI, cl. 2.

While a state can't create disguised priorities to contravene the order of distribution Congress set out in § 507, 4 Collier on Bankruptcy, § 541.13, 541–78 (15th ed. 1994), Congress itself certainly can "award[ ] to a ... favored creditor a super-bankruptcy priority which contravenes those priorities established by the Bankruptcy Code." *Universal, supra,* 114 B.R. at 943. The statutory record is clear that Congress intended to do precisely that. Indeed, 7 U.S.C. § 499e(c)(1) expressly states that the statute's object is to prevent secured creditors from gaining priority over unpaid produce sellers. Moreover, as previously noted, the legislative history of § 541 notes that a PSA trust, the model for the PACA trust, is excludable from property of the estate.[13] Thus, PACA "gives a special and limited class of creditors a statutory priority" that not only trumps other security interests, *Merberg, supra,* 166 B.R. at 570, but takes the encumbered assets out of the estate. *Id.,* at 570–71; *Monterey House, supra,* 71 B.R. at 247 (PACA trust provisions do not create lien, but trust fund which is not estate asset). Thus, as to Congress, simply calling certain funds a "trust" does in fact make them excludable under § 541. Without more, however, creation of a statutory priority does not also create fiduciary obligations which may be nondischargeable under "trust" subject to § 523(a)(4).

The word "trust" is not found in § 523(a)(4). Rather, the statute excepts from discharge debts arising from "fraud or defalcation while acting in a fiduciary capacity." Plaintiffs bear the burden of proving the two elements necessary to establish the existence of a fiduciary capacity: 1) that the trust arose prior to the act of wrongdoing, and 2) that the trust relationship consists of more than the debtor's contractual obligations. *In re Hayden,* 44 B.R. 9, 11 (Bkrtcy.N.D.Ohio 1984). A PACA trust fails to satisfy the second requirement.[14] Neither the substantive nor the remedial provisions of PACA suggest that a PACA creditor is entitled to demand any more of a debtor than payment of the contract price. Although PACA creditors have expanded rights against a debtor's assets, their only remedy against the debtor is an action for the contract price. 7 U.S.C. §§ 499e(b), 499g(b). Similarly, as previously noted, the legislative history states specifically that the PACA trust won't "change the methods of doing business by either the seller or the buyer." H.R.Rep. No. 543, 98th Cong., 1st Sess. 4 (1983), U.S.Code Cong. & Admin.News 1984, 407. A conventional trust works a change in the way parties do business, imposing on the trustee a fiduciary obligation of heightened care, involving "confidence, trust and good faith." *Martin, supra,* 161 B.R. at 676. Congress' intent not to change the way buy-

---

13. The legislative history of the PSA trust provisions is even more explicit that the purpose of the trust is to change the distribution scheme set out in the Bankruptcy Code. S.Rep. 94–932 specifically mentioned as an example of the evil targeted the January 1975 bankruptcy of American Beef Packers (ABP), which left "producers in 13 states unpaid for a total of over $20 million in livestock sales."

Of particular concern to the livestock producers in this instance was the fact that ABP's principal source of financing, General Electric Acceptance Corporation, stood ahead of them among the bankrupt's creditors by virtue of its duly protected security interests in ABP's inventory, i.e., livestock and derivative products which the producers had sold on a cash basis and for which they had not been paid.

S.Rep. 932, 94th Cong., 2d Sess., 5 (1976), U.S.Code Cong. & Admin.News 1976, 2267, 2271.

[T]he trust provision offers producers the best protection against packer bankruptcies. They would not receive their money, the money they expected to receive when they sold their livestock, before secured creditors.

*Id.,* at 13, U.S.Code Cong. & Admin.News at 2279.

14. We also believe that the first requirement can not be met where commingling occurs. A produce seller's beneficial interest in the produce sold, and in the proceeds, products and receivables therefrom, arise at the time of delivery. *Fresh Approach, supra,* 51 B.R. at 423. Its interest in commingled assets, however, arises only after the debtor fails to pay and is unable to prove that commingled assets aren't trust assets.

ers and sellers do business is reflected in the very features of the PACA trust that distinguish it from a conventional trust. The ability to commingle funds, for example, " 'weighs heavily against both the existence of an identifiable trust res and the necessary intent to create a trust.' " *Ramonat, supra,* 82 B.R. at 720, *quoting Wilmington Trust Co. v. Martin (In re Martin),* 35 B.R. 982, 986 (Bkrtcy.E.D.Pa.1984). In addition, PACA's stated purpose is to remedy the "burden on commerce in perishable agricultural commodities" posed by the liens of secured creditors. 7 U.S.C. § 499e(c)(1). That purpose is not furthered by imposing a fiduciary obligation on the debtor for the benefit of produce sellers, but by giving produce sellers an interest in the debtor's assets that trumps those liens. A final factor, which is, admittedly, more suggestive than conclusive, is that § 525(a) specifically exempts PACA debtors from the general prohibition against discrimination for failure to pay a discharged debt. This provision thus contemplates that PACA liabilities, like other contractual obligations, can be discharged.

For the foregoing reasons, we conclude that the so-called "trust" impressed upon the assets of buyers of fruits and vegetables by 7 U.S.C. § 499e(c) does not create fiduciary obligations that may be nondischargeable under § 523(a)(4) of the Bankruptcy Code.

Counsel for Debtor shall settle an order consistent with this Memorandum of Decision on five days' notice to Plaintiffs' counsel.